### BUHLER *v.* TROMBLY.

1. STATUTE OF FRAUDS — PART PERFORMANCE — PAROL CONTRACT TO CONVEY LAND.

Mere occupancy of a dwelling and the making of ordinary repairs and changes to suit the premises to the needs of the occupant, paid for out of partnership funds belonging to the promisor and promisee, are *not* sufficient part performance to take a parol promise to convey out of the statute of frauds. CARPENTER, C. J., and MCALVAY, and MONTGOMERY, JJ., dissenting on rehearing.

2. GUARDIAN AND WARD — PROMISE OF WARD — REVOCATION BY GUARDIAN.

A promise which may at any time be recalled by the promisor may, on his becoming non compos mentis, be recalled and revoked by his guardian.

3. GIFTS—REAL ESTATE—PAROL—PART PERFORMANCE.

A promise, as a mere act of bounty by a foster father, to permit his foster son to occupy certain premises rent free during the father's life, and that they shall become the property of the son on the father's death, is not a contract, in the absence of

any showing that the son agreed to do anything, or ever did or refrained from doing anything, or in any way changed his condition or circumstances, or was induced to forego any benefit or assume any liability because of or relying on the promise, though he entered on the premises, and for several years occupied them without paying rent. CARPENTER, C. J., and McALVAY and MONTGOMERY, JJ., dissenting on rehearing, on the ground that the promise by the son, fully performed, to live in the house that he might be near the partnership business of himself and foster father, constituted a sufficient consideration.

Appeal from Wayne; Frazer, J.  Submitted January 11, 1905.  (Docket No. 45.)  Decided February 27, 1905. Motion for rehearing granted December 30, 1905.  Reargued April 3, 1906.  (Docket No. 1.)  Former opinion affirmed July 3, 1906.

Bill by Christian F. Buhler against Robert Trombly, guardian of Joseph Buhler, an incompetent, to enforce a parol agreement for the occupancy of certain real estate, and to restrain summary proceedings for the possession of the same.  From a decree for complainant, defendant appeals.  Reversed, and decree entered for defendant.

*Maybury, Lucking, Emmons & Helfman*, for complainant.

*De Forest Paine*, for defendant.

OSTRANDER, J.  The contention of complainant is that, by the mutual parol agreement of himself and Joseph Buhler, complainant was to occupy, rent free, certain premises on Macomb street, in Detroit, belonging to Joseph Buhler, during the life of said Joseph, and that, at his death, the premises were to be the sole property of complainant.  The bill is filed to give effect to this agreement so far as the rent of the premises is concerned, to restrain certain proceedings at law brought to recover possession of said premises, and that the court "determine that your orator is entitled to continue in the use, occupation, and

possession of said premises under and by virtue of the said contract and agreement between your orator and said Joseph Buhler." The bill was verified on November 3, 1903. Prior to that time, and on the 10th of January, 1903, Joseph Buhler had been, upon the application of complainant, adjudged by the probate court for the county of Wayne to be mentally incompetent to transact his business, and the defendant in this suit, Robert Trombly, had been on or about that date appointed guardian of the person and estate of said Joseph Buhler. The guardian so appointed, before the filing of the bill, demanded of complainant rent for the property in question, payment of which was refused, served upon complainant notice to quit the premises, and later began before a circuit court commissioner summary proceedings to obtain possession of the premises, which were pending when the bill was filed. The guardian filed an answer, in which he denies that any such agreement as that relied upon in the bill was ever made, and in the answer claims the benefit of a cross-bill, and asks for an accounting as to the amount due to defendant for rent, for restitution of the premises, and for other relief. Proofs were taken in open court.

The vital questions in the case are whether any such agreement as is claimed was made, and, if made, whether there has been such performance on the part of complainant as to warrant a court of equity to enforce specific performance of the agreement to the extent prayed for in the bill.

It is at the beginning important to learn the terms of the agreement asserted, and for these we look to the bill of complaint. The bill, after stating the adoption of complainant by Joseph Buhler, his rearing and education as Buhler's own son, and the fact that at the age of 24 Joseph Buhler took him into partnership in business, avers that on July 26, 1887, complainant was married, and that at that time and prior to that time Joseph Buhler had been carrying on a meat business at 210 Randolph street, in

Detroit, under the firm name of Joseph Buhler & Son, and—

" That said Joseph Buhler desired your orator to remain and continue in said business after he should be married, and desired your orator to live close by the place where the said business was being conducted; that said Joseph Buhler, a short time prior to your orator's marriage, proposed to your orator and promised and agreed with him that, if your orator would continue after his said marriage to remain in said business with said Joseph Buhler, and would live close to the place or store where the same was being conducted, said Joseph Buhler would purchase for your orator a home in the vicinity wherein your orator and his family should live without paying rent therefor, and upon the death of said Joseph Buhler the same should be and become the sole property of your orator; that your orator then and there accepted the proposal of said Joseph Buhler as hereinbefore set forth, and promised and agreed to conform to and abide by the terms and conditions thereof."

These are the terms, and all of them, of the agreement alleged. The marriage of complainant is not asserted to have been any consideration for the agreement, nor an act in part performance thereof. The bill sets out that thereafter Joseph Buhler purchased the premises in question, turned them over to complainant for a home, and that from a period shortly after his marriage complainant and his family have occupied the premises continuously under and by virtue of the terms of the said agreement, and that Joseph Buhler has never demanded or collected any rent from complainant for the premises, but has, on the contrary, at all times said that the property belonged to complainant. The bill further alleges the expenditure of large sums of money by complainant, to the knowledge of Joseph Buhler, in repairing, improving, and beautifying the property, all in reliance upon the said contract; that complainant has at all times lived up to and carried out the duties and obligations resting on him under said contract; and that Joseph Buhler has never expressed a desire nor made an attempt to change or alter or revoke said con-

tract, and that the contract has at all times continued to be, and is now, in full force and effect.

The decree appealed from by defendant finds and recites an agreement considerably broader in terms than the one set out in the bill of complaint, adjudges that complainant is entitled exclusively to "the use, possession, and enjoyment and ownership of the aforesaid premises during the lifetime of said Joseph Buhler," and restrains permanently the attempt to collect rent, and any disturbance or interference with the quiet and peaceable possession of the premises by complainant.

Joseph Buhler was not sworn as a witness. At the hearing in the court below, the files and records in the case of Robert Trombly, guardian, etc., complainant, against Andrew Klersy and Helen Klersy, defendants, were offered in evidence. The bill in that case was filed on August 5, 1903, and the decree therein on April 11, 1904, and an appeal from that decree has been taken to this court. The offer made is broad enough to include the testimony taken in that case, from which testimony it appears (and it has been examined for no other facts) that Joseph Buhler was at the hearing in the circuit court sworn as a witness, and attempted to give testimony, and that he appeared to be unable to understand the questions asked him, or the character of the business being transacted for him.

In the case at bar the only witness sworn on behalf of defendant was the defendant himself, and there is nothing in his testimony to indicate that he has any knowledge of the alleged agreement.

The testimony shows that some time prior to 1866 Joseph Buhler and his wife, a childless couple, then residents of Detroit, took complainant, an infant, into their home, and that Joseph, and his wife, while she lived, thereafter always treated him and spoke of him as their son. In 1866, when he was about 8 years old, he was baptized in St. Mary's Church, Detroit, the baptismal record describing him as Christian, adopted son of Joseph Buhler and his

wife. From the age of 7 until he was past 12 he attended St. Mary's School, and later, for a period of six months, a classical school. He then went to work for Joseph, who kept a butcher shop at 210 Randolph street, the family living over the shop. The boy was not paid wages until he was about 22 or 23 years of age, but was clothed and furnished some money. When he was about 23 years of age, he for 6 months worked by agreement for $8 a week, and then Joseph made him a partner in the business. Complainant did not contribute to the capital of the partnership. There were no written articles of partnership.

Complainant testified that Joseph said:

" I will tell you, I will take you right into business with me, and we will be right in together, and whatever you will use you will use, and whatever I use I will use, and we will all be at home, one, partners."

On cross-examination he testified:

" And after while he said he would take me in business, and then I could use what I wanted. * * * I went into that business with Joseph Buhler, and drew out what money I needed. I am not guessing about the amount of money I drew out of that business, but I should judge it would be about three or four hundred dollars a year— what it cost me to live—and probably $500."

They did considerable business. Complainant worked early and late, and was apparently in all respects a dutiful foster son and a valuable aid in affairs of business. No division of profits was made, and complainant says that over and above the sums which he took Joseph had the proceeds of the business. In 1887 complainant was married. Five or six months before his marriage, complainant being then 28 years old, he had, he says, a talk with Joseph, then a man 59 or 60 years of age, in which he spoke of getting married, and it was at or about this time that the alleged agreement was made. In substance, complainant testified that Joseph Buhler said that, if he would settle down and get married, he wanted him to be near the business.

"He told me: 'I will buy a home for you, because I want you right near the business, because I am not as young as I used to be, and it is hard to work, and you will have to be here early and late, and you cannot live far away; and I will buy a home for you, and this house is yours free of rent until I die, and after that the house is yours.'"

On cross-examination he testified:

"I spoke of getting married. So he says, 'Yes, that would be very good.' We would settle down. He didn't want me to live far from the house, so he says: 'I will buy a house for you in the neighborhood here, and I want you to be right here near the business, and we had the use of the barn as well and everything handy, because you have to be here early in the morning and late at night, and you know you can't live far away;' and he bought the house, three or four months before I was married, for me. * * *

"Q. Do I understand you to say that you would not have got married at all if this proposal had not been made to you?

"A. That is something I cannot say. I would very likely have got married as well.

"Q. You would have been willing to go right on as you were before, whether he made this proposal or not, would you not?

"A. How do you mean? Proposal for what?

"Q. Proposal to buy you this homestead.

"A. I have not made any proposal to him. He proposed it to me.

"Q. You expected to get married anyway?

"A. Oh, certainly; naturally I would.

"Q. And you were willing to continue in the business?

"A. Certainly.

"Q. Whether he bought that house for you or whether he didn't, you were willing to continue in the business?

"A. Certainly.

"Q. You didn't have any other business to go to but that?

"A. No, sir. I was always home, and from a child up never knew anything else."

Frances Knopp, a witness sworn for complainant, who had known Mr. and Mrs. Buhler since she was a little

girl, entered their family to work and as a companion in February, 1887. At that time the sign on the butcher shop, she says, was "Joseph Buhler & Son," and the family lived over the shop. She ate at the same table and sat at the same fireside with the family. She heard a conversation between Joseph Buhler and Christian before his marriage about a house; that they agreed, and wanted to buy Chris a house, so that he would be near the shop; that, if they could have had Mr. Chris Buhler upstairs in the same building with them, it would have suited them better to have him near the shop; that they wanted Chris to live as close as that because he was the main hand in the shop.

"It was Mr. Joseph Buhler who made the advances and induced Chris that he wanted him, to have him near the shop, and that he would buy him a home close by; and it was his wish and inducement that he did that. Mr. Joseph Buhler made the advances. He said he wanted Chris to live there so that he would be early and late right near the shop, and be right with it always. Chris agreed to that. Chris was satisfied. * * * Chris was present when it was spoken about and decided to buy the home on Macomb street. Mr. and Mrs. Buhler and Christian were present at that time. I think it was at the breakfast table they spoke of it. Joseph Buhler said, 'We will buy the house on Macomb street, and give it to you for a home.' Chris said, 'All right.' Chris was satisfied, and he says, 'All right, if it suits you, it suits me.' That is about all they said. So the house was bought. There might have been a lot more said, but I could not give just every word about it. That is all I remember. Chris was not present at any other time when this subject was mentioned by Joseph Buhler. I don't remember any other time when he was present. It was mostly spoken of at the butcher shop. * * * He says that to have the house nearer the shop the better, the nearer he lived the better he would like it. He wanted Christian to live near the shop. If he could have taken him upstairs, and arranged with him to live above the shop, it would have been better. That could not be done. There was something said at the time Joseph Buhler spoke to Chris about buying this house about living upstairs and being

close to the business. That was the time it was said. It was all at one time, and Chris agreed to anything his father asked him to do; if it was satisfactory to his father it was satisfactory to him."

There is some other testimony to the same effect. There is testimony that when the premises in question were purchased by Joseph Buhler he said, and it was otherwise talked in the family, that the deed would have been taken in complainant's name but for the fact that there was a barn upon the premises which the old gentleman desired to use and did use more or less; that the desire to control the barn and the use of it was more or less determinative of the question of who should be named as grantee in the deed.

We think this testimony and all of the testimony in the record lacks something of proving the agreement set out in the bill, or any agreement. At the time of the talk or talks upon the subject between complainant and his father, complainant was already a partner in business with his father. He had been told, as he testified, by his father, that eventually the business would all be his. Both the interest and duty of complainant were served by continuing his relations with his father and with the business. Complainant did not assume any obligation nor forego any advantage because of what his father proposed to do and did do for him. He worked no more hours after the house was bought than he had previously worked. It was rather the promise of a gift than a bargain or agreement in the proper meaning of that word. Complainant says that he has performed faithfully the contract and agreement. As has already been said, there was nothing to perform. He has done nothing that he would not have done if the home had not been furnished to him by his father, unless it may be said that some money expended upon the property entitles him to consideration. As to that, it appears that he was married in 1887; that some time after that Joseph Buhler bought the property in question; that when he bought it, it was leased, and that for a year, or until the

lease expired, Christian lived on Columbia street, sleeping at home, but for the most part taking his meals, as he had always done, over the shop; that after the tenant left the property in question some $300 was spent upon the house in tearing out partitions, painting, papering, and other changes. This money was drawn out of the firm, and so was the money paid for taxes so long as the partnership continued. Some of the windows have been replaced, the house has been occasionally painted; some other repairs have been made to it and also to the barn upon the premises. Apparently, complainant has kept the premises at all times in good repair. Joseph Buhler has all the time since dissolution of the partnership paid the taxes, and upon at least one occasion assisted in a small way to pay for painting. Complainant has never paid any rent, and has occupied the premises upwards of 16 years, during a part of which time he himself says the rental value was $30 a month, and the remainder of the time $20 a month. If we were to say that all of these expenditures were made in reliance upon the promise of Joseph, it would not be part performance of a parol contract to convey land. There is ground for finding that the changes in the building were for convenience of complainant, as have been the repairs made during his occupancy of the premises. The most that can be said of the matter is that there was a promise on the part of Joseph to give a life estate, and finally a fee, carried out, so far as he was concerned, by placing complainant in possession of the premises; a promise which might at any time be recalled without doing violence to legal rules or creating any right of action on the part of complainant. If Joseph Buhler had the right to recall his promise, his guardian, who has control of his person and estate, may likewise recall and revoke the promise.

There is more or less persuasive testimony in the record, not specifically referred to, tending to show that Joseph Buhler intended that the property in question should be occupied by complainant without payment of rent, and

should, upon his death, belong to complainant, and that he, upon different occasions and to different people, spoke of the property as Chris' property or Chris' home.    The fact that complainant was left in possession after the dissolution of the partnership is some evidence that the original intention continued.    But it also appears that in 1891 the partnership was dissolved, the place of business moved, Joseph Buhler retired from the firm, and Christian continued the business; that on May 1, 1891, complainant gave to Joseph Buhler his note, due one year after date, containing no provision for interest, for $2,464, and that this sum represented the assets of Joseph Buhler & Son on February 4, 1891, as Christian testified, or represented the stock that was left and·the fixtures and the horses and wagons and the money that was in the bank; and that his father told him he never would have to pay the note, as it simply represented the value of the property which he had turned over to his son.'    Complainant never has paid the note nor paid interest upon it, and it is apparently, because of the statute of limitations, not a valid obligation.    September 1, 1897, he borrowed from Joseph Buhler $1,291, giving his note therefor, due one year after date, no provision being made in the note for interest.    Upon this note he has paid neither principal nor interest, and it is apparently, because of the statute of limitations, no longer a valid obligation.    September 11, 1900, he borrowed of his father $1,000, giving his note therefor, due five years after date, and this note contains no provision for interest, and no interest has been paid. It is in evidence that the defendant, before being appointed guardian for Joseph Buhler, acted as his agent, beginning in 1896 or 1897; that in June, 1900, which was prior to the giving of the last note to Joseph Buhler by complainant, he was sent by Mr. Buhler to see if he could not make arrangements with Christian to pay a certain amount of rent for the house; that he did go, asked Christian to pay rent, and was told by him that he could not pay any rent; that the taxes upon the property have averaged since 1887

$40 to $45 a year.   Complainant testified that the first demand for rent of the premises was made after defendant was appointed guardian, but he does not specifically deny the fact sworn to by the defendant.   His testimony is, "While Robert Trombly was the agent of Joseph Buhler, I don't think he has asked me to pay rent for the premises; not to my knowledge."

It is said on the part of complainant that the case is on all fours with that of *Wright* v. *Wright*, 99 Mich. 170 (23 L. R. A. 196).   That case has been cited as authority for the proposition that an oral contract to give property at death in consideration of care or labor will be enforced in equity if the consideration has been paid or performed. See *Owens* v. *McNally*, 113 Cal. 444 (33 L. R. A. 369).

In *Wright* v. *Wright* two justices agreed that a parol contract to convey land could rest in implication, and that there could be such part performance of the implied contract as to warrant a decree for specific performance.   A third justice agreed to the decree entered, but in a separate opinion, and upon a different ground, and two justices strongly dissented.

In *Albring* v. *Ward*, 137 Mich. 352, the opinion in *Wright* v. *Wright* was relied upon by complainant to sustain devolution of property by virtue of the adoption of a child under the provisions of a void statute, and its authority for any such proposition was denied.   But *Wright* v. *Wright* is otherwise easily distinguished from the present case.   In none of the other cases cited and relied upon by complainant do we find authority for the decree in the present case.   It is unnecessary to review them. In each case an agreement was proven, and satisfactory proof furnished of substantial performance of the agreement on the part of the party seeking relief.   Here we do not find any agreement—any contract—to have been made.   Considered in the light of complainant's own testimony, there was an act of bounty, merely, on the part of his father, which complainant naturally, and to his profit, was willing to accept; and, as has been already stated, it

does not appear that he agreed to do anything, or ever did or refrained from doing anything, ever in any way changed his condition or circumstances, was induced to forego any benefit or assume any liability, because of or relying upon the promise of the father.

There is much in the case inclining one to look kindly upon the claims of the complainant, and to wish that the bounty of the foster father might equal the expectations of the son. It is to be considered, however, apart from the very clear effect of the testimony referred to, that Joseph Buhler is living, that he is shown to have been a rather careful business man, that he is owner of the premises in question, and that to sustain the decree below will amount to first making and then enforcing an agreement based upon no legal consideration, to divest him of the use and of the fee of the premises in question.

The decree of the court below is reversed, with costs, and a decree will be entered in this court awarding to defendant restitution of the premises, unless complainant shall, within 30 days after notice of said decree, pay to defendant, at the rate of $20 per month, rent from July 1, 1903, to the time of said payment; occupancy thereafter of the said premises to depend upon the agreement of the parties.

MOORE, C. J., and CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred.

### ON REHEARING.

OSTRANDER, J. I have found no reason for changing the opinion expressed when the case was first before this court.

GRANT, BLAIR, and HOOKER, JJ., concurred with OSTRANDER, J.

CARPENTER, C. J. (*dissenting*). The object of this suit is to enforce a certain oral agreement described in complainant's bill as follows:

"Said Joseph Buhler (defendant's ward), a short time prior to your orator's marriage, proposed to your orator and promised and agreed with him that, if your orator would continue after his said marriage to remain in said business with said Joseph Buhler (this was a meat business in which said Buhler and complainant were partners), and would live close to the place or store where the same was being conducted, said Joseph Buhler would purchase for your orator a home in the vicinity wherein your orator and his family should live without paying rent therefor, and that upon the death of said Joseph Buhler the same should be and become the sole property of your orator; that your orator then and there accepted the proposal of said Joseph Buhler as hereinbefore set forth, and promised and agreed to conform to and abide by the terms and conditions thereof."

The bill also sets out that thereafter Joseph Buhler purchased the premises in question, turned them over to complainant for a home, and that from a period shortly after his marriage complainant and his family have occupied the premises continuously under and by virtue of the terms of said agreement.

The trial court rendered a decree in favor of complainant. This court (see ante, 557) reversed that decree upon the ground that the testimony of complainant and his witnesses—and this testimony was uncontradicted—did not warrant the conclusion that any agreement was made by him and defendant's ward. The facts are fully stated in our former opinion. A rehearing was granted. The case has been reargued and we are called upon to again determine whether or not such an agreement was made, and, if so, whether it can be enforced. I think that the agreement was made and that it was also enforceable. I proceed to state such of the testimony as, in my judgment, establishes the agreement.

Complainant testified that defendant's ward "told me, 'I will buy a home for you because I want you right near the business.   *   *   *   I will buy a home for you and this house is yours free of rent until I die, and after that the house is yours.   *   *   *   I will buy a house for you

in the neighborhood here and I want you to be right near the business;'" that he shortly thereafter—in 1888—moved into this house and has lived there ever since. Frances Knopp testified:

" It was Mr. Joseph Buhler who made the advances and induced Chris that he wanted him to have him near the shop, and that he would buy a home close by. * * * He said he wanted Chris to live there so that he would be early and late right near the shop and be right with it always. Chris agreed to that; Chris was satisfied."

There is other testimony corroborating what I have quoted, and to which I need not refer. It is obvious—and this was recognized in our former opinion—"that there was a promise on the part of Joseph to give a life estate and finally a fee," but we held that promise "might at any time be recalled without doing violence to legal rules or creating any right of action," because "it does not appear that he (complainant) agreed to do anything, or ever did or refrained from doing anything, ever in any way changed his condition or circumstances, was induced to forego any benefit or assume any liability, because of or relying upon the promise of the father."

In making this statement, we overlooked this, viz. (at least I overlooked it in assenting to said statement), that complainant agreed to live in the house in order that he might be near the joint business conducted by his foster father and himself, and that he faithfully carried out this agreement. By making this agreement, and by performing it, complainant was induced to forego a benefit, and did thereby furnish a consideration which entitles him to enforce the promise of Joseph Buhler. Had not complainant made this agreement, he might have lived wherever he chose. By making it and by performing it, he deprived himself of this right which was otherwise his.

In determining whether or not this is a consideration for the promise of defendant's ward we resort to elementary principles.

" If the promisee, at the instance of the promisor and moved by his promise, do any act which occasions him even the slightest trouble or inconvenience, or in doing which he incurs a risk, the act so performed constitutes a valuable consideration for the promise." 6 Am. & Eng. Enc. Law (2d Ed.), p. 722.

" Indeed there is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not." 9 Cyc. pp. 312, 313.

In accordance with these principles it has been held:

The abandonment of one's plan to accept employment in a distant town and making his home upon a farm is a consideration for a promise to deed the farm. *Welch* v. *Whelpley*, 62 Mich. 15.

The giving up of one's home and employment and moving to a farm is a consideration for a promise to deed the farm. *Bigelow* v. *Bigelow*, 95 Me. 17. (These cases are in my judgment legally indistinguishable from the case at bar.)

Attending, or promising to attend, the promisor's funeral is a consideration for a promise to pay money. *Earle* v. *Angell*, 157 Mass. 294.

Granting to the promisor at his request the privilege of naming the promisee's child is a consideration for a promise to "provide for it generously and give it a good education." *Wolford* v. *Powers*, 85 Ind. 294.

Changing' the name of a female child at the request of the promisor is a consideration for his promise to leave her by his will $500. *Babcock* v. *Chase*, 92 Hun (N. Y.), 264.

The disclosure of certain information is a consideration for a promise. *Green* v. *Brooks*, 81 Cal. 328.

Abstinence from smoking, chewing, drinking, swearing, and playing billiards for six years, or until plaintiff's assignor was 21 years old, is consideration for a promise to pay $5,000. *Hamer* v. *Sidway*, 124 N. Y. 538.

Abstinence from use of tobacco until after promisor's death is consideration for a promise to pay $500. *Talbott* v. *Stemmons' Ex'r*, 89 Ky. 222.

Abstinence from use of intoxicating liquors is consideration for promissory note. *Lindell* v. *Rokes*, 60 Mo. 249.

The incurring of expenses of a trip, to Europe is consideration for the promise to reimburse such expenditures. *Devecmon* v. *Shaw*, 69 Md. 199.

The promise by a divorced wife that she will " conduct herself with sobriety, and in a respectable, orderly, and virtuous manner," is consideration for a promise to pay an annuity; the court saying: "She was legally at liberty * * * to conduct herself in these respects as she might think fit, and her promise to surrender her liberty * * * constituted a good consideration for his promise." *Dunton* v. *Dunton*, 18 Vict. 114.

I submit that the foregoing authorities correctly state and apply the law, and that if we follow that law, we must hold that there was a consideration for the promise of defendant's ward. I conclude, therefore, that there was an agreement between these parties. By the terms of that agreement defendant's ward agreed that complainant should have during the life the house rent free and on his death the fee, and complainant agreed to reside in the house, and performed his agreement.

Was this agreement enforceable? It was an oral agreement. It related to the transfer of land and was therefore within the prohibition of the statute of frauds. The fact, however, that complainant, in conformity with his contract, took possession of the land and held it for many years is such a part performance as to entitle him to relief in equity. *Lamb* v. *Hinman*, 46 Mich. 112; *Welch* v. *Whelpley*, supra; *Bigelow* v. *Bigelow*, supra.

As stated in our former opinion, after making the foregoing contract, complainant became indebted to defendant's ward. This indebtedness has never been paid, and the larger part of it is no longer a valid debt because of the operation of the statute of limitations. In considering

complainant's moral culpability in not paying this indebtedness, it should be remembered that complainant testifies—and this testimony is undisputed—that he was often assured by defendant's ward that he need not pay it. Said indebtedness has, however, no relation whatever to this controversy. Complainant's failure to pay it— whether morally justified or not—did not release defendant's ward from the obligations of his contract. Indeed, our consideration of this indebtedness will only tend, in my judgment, to obscure our view of the real controversy.

The decree of the circuit court should be affirmed.

McALVAY and MONTGOMERY, JJ., concurred with CARPENTER, C. J.