[No. 15757.   *En Banc.*   November 23, 1920.]

## CHARLES R. STURGIS, *Respondent,* v. M. McELROY, *as Administrator etc., et al., Appellants.*[1]

GIFTS (8)—EVIDENCE—WEIGHT AND SUFFICIENCY.   To establish a parol gift of real estate the proof must be "clear, unequivocal and definite."

GIFTS (1).   A parol gift of land must be an absolute, present gift and not a promise or expectation of some future act.

SAME.   To sustain a parol gift of real estate, possession must be given in furtherance of the gift, and it is not sustained by mere proof of possession long prior to the gift.

SAME.   To sustain a parol gift of real estate, permanent and valuable improvements must have been made which cannot be compensated in damages.

SAME.   To sustain a parol gift of real estate, the donee must have changed his condition or circumstances or have been induced to forego some benefit or assume some liability upon the strength of the gift, raising an equity in his favor.

SAME (8)—EVIDENCE—WEIGHT AND SUFFICIENCY.   A parol gift of land to a son is not sufficiently shown by evidence that the father bought the land, saying he was going to give him the property or a life estate, which he never did, that, after his father's death, the son and other heirs gave a quitclaim deed to his mother, who permitted the son to use the property, pay taxes and make improvements which probably did not exceed the rental value, and after the giving of such quitclaim, no words were said to show a present giving.

PARKER, J., dissents.

Appeal from a judgment of the superior court for Pierce county, Fletcher, J., entered September 16, 1919, in favor of the plaintiff, in an action for specific performance, tried to the court. Reversed.

*Rickabaugh & McElroy, Theo. T. Jacobs,* and *W. L. Sachse (Chas. Bedford,* of counsel), for appellants.

*Leo & Flaskett,* for respondent.

[1]Reported in 193 Pac. 719.

MACKINTOSH, J.—Respondent seeks specific performance of a parol gift of a farm now in his possession, claimed to have been given him by his parents, Amos and Martha C. Sturgis, and seeks to have the title of the property quieted against the claims of the other heirs of his parents. The appellants appeal from a decree awarding to the respondent the relief prayed for.

Respondent became a resident of Pierce county in the year 1895. He was then about twenty-two years of age; he came from Michigan, where his parents resided and continued to reside until they died. In October, 1897, respondent was married to a resident of Pierce county. Shortly thereafter his father wrote a letter to a relative of the respondent by marriage, asking him to "look up a place in the vicinity suitable for Charlie to make a home on." The father was then advised to buy the property in question, and soon thereafter came to this state and purchased this property, paying $5,000 therefor and receiving a deed to it in his own name. Possession of the farm was surrendered by the then tenant, and respondent and his wife went upon it in 1898 and commenced to make their home there. They have resided there and farmed it continuously since that time, approximately twenty-one years. During the father's visit, at the time of the purchase, and during two other visits to the respondent in the year 1899, the father made repeated statements to several persons in the neighborhood indicating his intention of giving the place to the respondent; one of the witnesses testifying that: "it was the talk all the time that it was Charlie's farm and was purchased for Charlie." Another witness testified that the father had said "he was buying it (the farm) for Charlie"; this witness further stating that, when

7—113 WASH.

the father was advised by him to put his affairs in shape, he said, "there is no business he needed to finish up excepting the deed to this place in question, and that was Charlie's, to go to Charles at his death, or words to that effect." Another witness stated: "He told me that he bought it but that he was not going to move out, that he. was going to give it to Charlie." Another witness testified, "he told me he bought it for Charlie, his boy." Still another stated, "(the father) said he bought the place and put him on it. He told me he came out here and found Charlie with a family and no home and wanted to do something for him and bought the place for him and put him on it." Again, a witness said, "Plaintiff's father told me that he bought the ranch and gave it to Charlie, his son. . . . When he was talking with me about the place he said it was going to Charlie."

Soon after the last visit to respondent, his father returned to his home in Michigan, and died in December, 1899, no formal conveyance of the legal title to the respondent having been made. It is clear that, at the time of the father's death, there had not been such a gift of the farm by the parents of respondent as would, at that time, support the claim of respondent to the farm, for at that time there had been no such performance of acts by the respondent as would prevent the statute of frauds from defeating his claimed gift of the farm, nor was there any evidence of the farm having actually been given. The father died, leaving a will executed several years before the purchase of this property, in which will he did not dispose of this property, and which will contains no residuary clause, and the legal title of the property descended to the mother and the five children, including respondent.

After the death of the father, the mother made several visits to the respondent, during which she made repeated statements to a number of persons of the same import as those made by the father before his death. She also made statements in letters written by her and sanctioned certain acts of the respondent, all indicating an intention to consummate a gift of the farm. On April 3, 1902, respondent and all of his three brothers and a sister, who, together with their mother, had become vested with the legal title to the farm by inheritance from the father, executed a quitclaim deed of the farm to the mother, at the same time executing another quitclaim deed to the mother to certain lands in Michigan the legal title of which had been inherited by the mother and children, as the legal title to this land had been. The evidence on this question is far from satisfactory. The respondent testified that he received a letter from his mother shortly before the execution of the quitclaim deed, requesting him to execute the same, and that he executed the deed for that purpose. This letter was lost and could not be found. Respondent was not permitted to testify orally as to its contents, but he testified that he showed it to a number of persons, who were permitted to testify as to its contents and as to the stated reasons of the mother for so acquiring the legal title in herself.

This evidence was probably inadmissible for the reason that the letter was not properly identified, and without identification, witnesses should not have been allowed to testify as to its contents; but, assuming the letter was properly in evidence, it does not establish what is claimed by respondent, the testimony of the witnesses who claimed to have seen the letter being, "the substance of the letter was a request for Charlie to convey his mother this farm property for

the purpose of complying with the law in some way that would enable her subsequently, in some process of the adjustment of the estate, to re-deed this property to Charlie free from any embarrassment.'' One witness testified that, so far as he could remember, the deed was requested, ''in order for her to expedite matters and make a deed direct to him and clear up the title he must necessarily make the deed to her with the other heirs.'' The deed, in any event, fully vested the legal title in the mother. Thereafter, the testimony shows, oral statements were made by the mother which respondent claims indicate that a gift had been made. The strongest of these statements are as follows: By one witness: ''I also met the plaintiff's mother on the ranch in the fall of 1909, during the year of the Seattle fair. I was over there to dry hops. Charlie Sturgis had done quite a little improving; put in concrete posts under the kiln and fixed it up, and I said to his mother, 'the kilns are a great deal better than they were last year, he has fixed them up a little.' She said, 'Well, he could well afford to fix them, the place belongs to him.' ''. Another witness testified: ''I approached her in the matter of being interested in these (hop) contracts and told her at the time I made them I assumed that Charlie was the owner of the place, since which time I had found that the title had never gone to him, and that in some of these contracts I was acting for eastern brewers and dealers, and I felt a little unsafe in advancing money, because if he did not own the place it was more like paying it to a renter, and she told me the place was intended for him, and he would get it. To go ahead and make them as if he was the owner of it.''

In the year 1906, a railroad acquired a right of way across the farm, a deed was made to the right of way,

for which the company paid the sum of $3,000 direct to the respondent at the instance of the mother, and which she permitted him to retain as his own.

Taxes on the farm have been paid by respondent by money earned from the property, or by the mother from money sent from the state of Michigan. The tax receipts on their face indicate payment by the father while living, and thereafter by the mother. However, this may be explained by the fact that, upon the county records, the legal title to the property stood in the name of the father up to the time of the execution of the quitclaim deed to the mother, and thereafter in her name.

In letters written to the respondent by his mother, one of them in 1914, she said: "I earnestly hope that you will have a good crop of hops and get a good price for them so you can pay the rest of your taxes before they become delinquent." Later in the same year she says: "I am so anxious to know that you have sold them (the hops) and paid the rest of your taxes." In 1915, she expressed similar concern relative to the payment of taxes, and in 1916 she wrote to the respondent's wife: "Effie, I am so thankful you still have your home. . . . Hope you will keep the home for the children and that the little boys will be wise enough to keep the home another generation at least, and I would be glad if they could keep it for their own children."

The testimony indicates that the father had reason to be apprehensive as to the habits of the respondent and was fearful that, if he was put into ownership of the property, it might be dissipated. The evidence would also seem to indicate that there was some friction between respondent and his wife during the mother's lifetime, and for that reason it was inadvisable to vest title in the respondent.

On January 1, 1916, the respondent wrote to his mother: "Now about this place. It cost father $5,000. I told you and Amos (his brother) I would be willing to have you sell enough of my share of the property back there to pay Amos and the girls their share of the $5,000. I know that would be no more than right. As far as this property increasing in value, of course it has, but you must remember that I have put in 16 years of hard work clearing land, and have built several buildings. . . . I don't think it is right for me to pay $8,000 for this place when it only cost $5,000 in the first place and then give them all my property back there besides. There is not one of the children would have given ten acres of their property back there for this whole property when we got it." And considerable more of the same import. There are also in evidence some letters written by respondent's wife to the mother, wherein there are expressions which might be construed as indicating her desire that the mother put her in charge of the place.

As to what respondent had done in the way of making improvements on the farm and changing his situation, relying on the belief that the property was his, we find that, when he went upon the farm in the fall of 1898, it was already developed to a considerable extent, fifty-five acres, approximately, of which were in cultivation, the balance of forty-five acres being in pasture. He has during all these years cleared the forty-five acres, so that practically the whole farm is under cultivation. He has materially improved the buildings on the property and he estimates that he has spent at least $9,000 thereon. The time of making these several improvements has been spread over almost the whole of the twenty years or more that he has been on the place.

The mother died intestate in June, 1918. Thereafter appellant McElroy was appointed administrator of her estate, and he claims this farm as part of the estate in behalf of the other children.

The respondent, in his complaint, rests his right to the property in controversy solely upon a parol gift by the parents during his father's lifetime, and nowhere does he claim that his title comes from a gift by the mother. It is manifest, on the evidence, that it is insufficient to support the gift from the father and mother which was relied upon, and our inquiry must be to determine whether such a gift was consummated by the mother after she acquired the title in 1902.

It is to be borne in mind that a parol gift must be established by "clear, unequivocal and definite testimony," and the acts claimed to be done thereunder should be equally clear and definite. *Price v. Lloyd,* 31 Utah 86, 86 Pac. 767, 8 L. R. A. (N. S.) 870; *Buhler v. Trombly,* 139 Mich. 557, 102 N. W. 647, 108 N. W. 343; *Zallmanzig v. Zallmanzig,* 24 S. W. (Tex. Civ. App.) 944; *Harrison v. Harrison,* 36 W. Va. 556, 15 S. E. 87. When we examine the testimony we find that the evidence as to the gift by the mother is, in our eyes, no stronger than the evidence of a gift during the father's lifetime, and this we have already indicated is not sufficient. There is no testimony that is clear and unequivocal of a gift at either time, but merely of declarations, such as those we have set out in the statement of facts, that the property was bought for the respondent or that it was expected to be given to him. There is evidence in the case showing why the parents might not have desired or intended to make a present gift of the property to the respondent. A parol gift must be an absolute, present gift, not a

promise nor the expectation of some future act. It must be testimony of a gift *in praesenti*, and nowhere is there such testimony in the case. The testimony is no stronger than the expression, ''she made repeated statements to a number of persons in the neighborhood that the property had been bought for Charlie.'' But indications of intent do not comply with the law.

There is no testimony that the mother made a gift, the only testimony being that at sometime she said to one witness, ''the place belongs to him,'' and to another witness, ''the place was intended for him and he would get it.'' But the law requires more than this. It is very strict in its requirement that the proof be beyond controversy; that words be used which amount to a present gift, for the title to real property is not supposed to rest on flimsy parol evidence.

The admissions made by the respondent in his correspondence, his quitclaim deed to his mother, and the testimony that he went to his mother's home in Michigan, before her death, for the purpose of having her deed this property to him, but did not discuss the matter with her, plainly indicate that no parol gift was made by her.

Another requirement to sustain a parol gift of real estate is that possession must be given in furtherance of the gift. There is no evidence that possession was ever taken by the respondent in furtherance of a gift from his mother. He had been in possession for sometime before his father's death and for five years before the time at which the mother could have made a gift.

A third requirement of the law is that permanent and valuable improvements must be made which cannot be compensated for in damages. The evidence

is that no improvements of such a permanent and valuable nature were made by the respondent during the years in which he was in possession of the property before his father's death, and there is no evidence such improvements have been made in reliance upon a gift from the mother. In fact, the improvements were largely made before the time in which it was possible for the mother to have made the gift. *Burris v. Landers*, 114 Cal. 310, 46 Pac. 162; *Poorman v. Kilgore*, 26 Pa. St. 365. As a matter of fact, the testimony would seem to show that the improvements made did not exceed the rental value for this long period.

The fourth requirement of the law is that the respondent must have changed his condition or circumstances, or been induced to forego some benefit or assume some liability, upon the strength of the gift, such as would make it inequitable not to enforce the gift. Bearing in mind that we have found there is no gift during the father's lifetime, where is the evidence that the respondent has done or suffered any of these things relying upon a gift from the mother?

A most careful scrutiny of the testimony in the case shows nothing more than that the father had said he was going to give this property to the respondent, or to give him a life estate therein. There having been no gift by the father, and no title in the mother which she could give, up to the time she received the quitclaim deed from the heirs, all the things which were done by the respondent in aid of the purported gift prior to the death of the father, and after his death until the giving of the quitclaim deed, can have no force in sustaining the gift; and after the receipt of the quitclaim deed, which in itself is an indication no gift was intended by the mother, we find nothing in the record which shows that she used words of present giving.

An intention to give is not a gift, nor does the exercise of dominion confer title on the usurper. If the title to real property is. to be given to a person based upon a gift intended to be thereafter made, then we have established a new and unsteady foundation of title.

The record does not sustain the judgment of the lower court, which is hereby reversed.

HOLCOMB, C. J., BRIDGES, FULLERTON, MAIN, MOUNT, MITCHELL, and TOLMAN, JJ., concur.

PARKER, J. (dissenting)—I cannot see my way clear to concur in the final conclusion reached in the foregoing opinion. I agree that there had been no effective consummated gift at the time of the father's death, but the acts and words of the mother, and the possession and acts of the respondent in reliance thereon during the years following the mother's acquisition of full legal title to the farm, viewed in the light of the previous acts and words of the father and mother and respondent, convinces me that respondent had acquired equitable title to the farm by virtue of a gift consummated by the mother before her death. I do not read the record as showing that any taxes were ever paid upon the farm after respondent went into possession of it other than by money belonging to him —that is, money earned by him or money derived from rents of property belonging to him in charge of his mother in Michigan—and to me it is easy to account for the fact that the tax receipts did not run in respondent's name, because the legal title thereto stood in the name of the father and mother upon the records of Pierce county.

I also think that the evidence shows a considerable portion of the improvements were made by respondent in reliance upon the fact that the land was his, after

the mother had acquired full legal title to the farm and evidenced her recognition of the land being his, as he had prior to that time made improvements, believing that the land was going to be his. I do not think that it is necessary that there shall be determined some exact moment of time when the gift was consummated by the mother, but in looking to all that occurred during the long period of time respondent has been in possession of the land and treating it as his own, I think I can see that, at least at some time during that period, the gift became a consummated one. I think the judgment should be affirmed.