GROENING *v.* McCAMBRIDGE.

MINK *v.* SAME.

1. CONTRACTS—EVIDENCE—DECLARATION OF TESTAMENTARY INTENTION.

Statements by deceased that she would give or devise property to girl brought up by deceased and her husband *held*, merely declarations of testamentary intention and, while noncontractual in character, are evidence which might be considered with other circumstances in determining whether a contract was made.

2. COURTS—MINORITY OPINIONS.

Language of an opinion not concurred in by a majority of the court may not be considered as an authority.

3. SPECIFIC PERFORMANCE—CONTRACTS TO DEVISE PROPERTY.

Specific performance may not be had of an alleged oral contract to devise property where its terms are not clearly and unmistakably established by words and conduct of the parties and circumstances.

4. SAME—CONTRACTS—MUTUALITY—CERTAINTY—PERFORMANCE.

In order that specific performance may be granted of a parol contract, it must be mutual and the tie reciprocal and it must be certain in all essential particulars; there must be acts of part performance unequivocally referring to and resulting from the agreement which, as set up in the bill of complaint, must appear to be the one claimed to have been performed.

5. SAME—EXECUTORY AND EXECUTED CONTRACTS—LACK OF MUTUALITY IN REMEDY AS DEFENSE.

Lack of mutuality in the remedy, a defense to specific performance of an executory contract of a personal nature for continuing services, is no defense where plaintiff has fully performed hitherto unenforceable promise.

6. SAME—CONTRACT TO LEAVE PROPERTY—EVIDENCE—PERFORMANCE.
   Record in suit for specific performance of alleged implied contract to leave property to plaintiff who learned, after her marriage, that she was not the daughter of deceased by whom she had been brought up, *held*, barren of testimony that during deceased's lifetime either party thought there was a contract to give the property to plaintiff, without evidence of specific services to be rendered by her in consideration of an agreement to devise or that plaintiff's performance of services was done under contract.

7. CONTRACTS—IMPLIED CONTRACTS—EVIDENCE.
   Implied contract to leave property to plaintiff *held*, not to arise where claim is, essentially, that she was brought up as a daughter by deceased, that latter had made some expression of testamentary intention for her benefit and that she had performed services which a daughter would perform while she was a member of the family.

8. TRUSTS—CREATION—MENTAL COMPETENCY—EVIDENCE.
   Finding of trial court that deceased was mentally incompetent to execute trust instruments creating irrevocable trust for her support during her lifetime in trustee wholly unknown to her with remainder over to beneficiary with whom she had had but a casual acquaintance *held*, coincident with overwhelming weight of evidence also including testimony of friends and business and professional people that deceased could not understand very simple business transactions, even the value of money, that she could not grasp ordinary conversation and was of extremely simple mind.

Appeal from Ottawa; Miles (Fred T.), J. Submitted October 19, 1937. (Docket No. 63, Calendar No. 39,703.) Decided November 10, 1937.

Bill by Otto Groening and Emma Groening Ludwig against Matilda Elizabeth McCambridge and J. Thomas Mahan, as trustee and individually, to set aside a trust agreement. Bill by Mary Mink against same defendants to set aside a trust agreement and also for specific performance of a contract. Cases consolidated for trial and appeal. Bill

of plaintiff Mink dismissed. Decree for plaintiffs Groening and Ludwig. Plaintiff Mink appeals. Defendants McCambridge and Mahan cross-appeal. Decrees affirmed.

*Charles E. Misner,* for plaintiffs Groening and Ludwig.

*Wm. J. Balgooyen,* for plaintiff Mink.

*Arthur Van Duren* and *Charles K. Van Duren,* for defendants.

FEAD, C. J. Minna Schmidt, formerly Kruegel, died at Grand Haven January 7, 1936, at the age of 72, leaving plaintiffs, her brother and sister in Germany, as her heirs at law. On July 29, 1935, she executed to J. Thomas Mahan, as trustee, trust instruments and deeds of her real estate consisting of two lots, worth about $6,000, and of some stock and bonds of small value, creating an irrevocable trust for her support during her lifetime and conveyance of the residue to Matilda McCambridge at her death. Plaintiff Mary Mink had been reared as a daughter by Minna Kruegel Schmidt.

Plaintiffs filed this bill to set aside the trust instruments on the ground of undue influence, Mrs. Schmidt's mental incompetency to execute them, and that they were unconscionable. Mary Mink filed bill for specific performance of a contract that she should have the whole estate on Mrs. Schmidt's death. The cases were heard together. The court entered decree setting aside the trust deed and denying relief to Mary Mink.

Mary Mink was born in Germany in 1893. She was taken into the Kruegel family at three years of age and thereafter called by their name. In 1906,

when she was 13 years old, they came to America and she was entered at the port of New York as their daughter. They went to Chicago where Mary attended school and was confirmed in the church as Mary Kruegel. In 1909, the Kruegels moved to Grand Haven, Michigan. Mary assisted in work at the home, including commercial washing. She also earned money at odd jobs, janitor work, and, when 16 years of age, in a restaurant. Later she worked in a meat market owned by the Minks. Mrs. Kruegel collected her wages. At the age of 19, in 1912, Mary married Harry Mink, left the Kruegel home and moved about from place to place. Mr. Kruegel died in 1914. Mrs. Kruegel married Schmidt in 1916 and he died in 1922.

While the Minks lived in Michigan the families visited each other from time to time. When Mary Mink's daughter was born Mrs. Kruegel attended Mary and stayed at the Mink home all winter.

In 1919 the Schmidts and Minks drove to California in two cars. They did not live together in California. The Schmidts returned to Grand Haven. The Minks remained. In 1921 the latter moved to Kansas where they lived until July, 1934. During that time, in 1926 or 1927, Mrs. Schmidt visited the Minks in Kansas one winter and the Minks visited Mrs. Schmidt in Grand Haven for about three months.

In 1934 the Minks sold out their effects in Kansas and, July 9th, went to live with Mrs. Schmidt at Grand Haven at her request. During the time they lived together the Minks paid the expenses of the house, including grocery and fuel bills, and Mrs. Schmidt took care of the taxes. In March, 1935, Mrs. Schmidt deeded 11 lots to the Minks. Dissension arose between them. Mrs. Schmidt consulted

a circuit court commissioner with a view to having the Minks expelled from the home. Mink consulted the probate court with the view of having Mrs. Schmidt declared an incompetent and having a guardian appointed for her. About June 1, 1935, the Minks moved out. Sometime thereafter defendant McCambridge moved in to take care of Mrs. Schmidt.

In 1928, Mrs. Schmidt made a will, the precise terms of which are not wholly clear, but in which Mary Mink was the principal or sole beneficiary. She destroyed the will in the summer of 1935 after the Minks left her home and with the statement that they had gotten all they were going to get from her.

Mary did not know she was not the child of the Kruegels until after the death of Mr. Kruegel. Minna told her the fact during the visit in Kansas about 1927.

The record does not show when or how Mrs. Schmidt became possessed of property. On many occasions she told the Minks and others that her property would go to Mary after her death. But she also made statements that she was going to leave her property to various people, to the city, to plaintiffs, to her nephew Otto and to different neighbors or their children.

In her original bill, to set aside the trust instruments, Mary Mink claimed she was an adopted daughter and entitled to take under the law of descent. By amendment, however, she prayed specific performance of a contract that "in consideration of the comfort, society and personal services of the said plaintiff, the said deceased would give the plaintiff everything she owned when she was through with it."

Standing alone, Mrs. Schmidt's statements that she would give or devise property to Mary were merely declarations of testamentary intention, non-contractual. But, of course, they may be considered with other circumstances in determining whether a contract was made.

Mary does not claim an express contract but urges that the circumstances raised an implied contract, under the authority of *Wright* v. *Wright*, 99 Mich. 170 (23 L. R. A. 196), in an opinion in which, page 175, it was said:

"We think there may be said to be a contract, impliedly at least, that defendant was to have this property."

This language is not authority because it was concurred in by only two justices and not by a majority of the court. *Buhler* v. *Trombly*, 139 Mich. 557, 568; *Westbrook* v. *Elder*, 264 Mich. 138. In *Albring* v. *Ward*, 137 Mich. 352, the *Wright Case* was not viewed as dispensing with proof of a contract to convey or devise property. Nor can we accept it as authority for the proposition that specific performance may be had of a contract whose terms are not clearly and unmistakably established by the words and conduct of the parties and the circumstances.

The test is:

"The contract or agreement sought to be enforced must be mutual and the tie reciprocal. It must be certain in all essential particulars. There must be acts of part performance, unequivocally referring to and resulting from the agreement. The agreement set up in the bill of complaint must appear to be the one claimed to have been performed. * * *

"The doctrine of mutuality of remedies applies only to executory contracts and not to executed contracts. Accordingly, if plaintiff has fully performed her unenforceable promise, the fact that before such performance there was a lack of mutuality in the remedy is no defense." *Woods* v. *Johnson*, 266 Mich. 172, 174, 176.

The record at bar is wholly barren of testimony that during the lifetime of Mrs. Schmidt either party thought there was a contract to give the property; and there was no evidence of specific services to be rendered by Mary in consideration of an agreement to devise. The court cannot make a contract for the parties and then enforce it.

Nor was there such a performance of services by Mary as to justify a finding that they were done under contract. Until she married and left the home Mary did nothing for which she was not compensated by having a home nor which is unusual to any child in similar circumstances. For over 20 years she rendered no services or substantially none. When she returned to the home in 1934 nothing was said about a contract to convey the property nor did she continue to render the services until Mrs. Schmidt's death. The circumstances disclose no trace of contract.

Reduced to its essentials plaintiff's claim is that an implied contract to devise property arose merely from the facts that she had been brought up as a daughter by Mrs. Schmidt, that Mrs. Schmidt had made some expression of testamentary intention for her benefit, and that she had performed services which a daughter would perform while she was a member of the family. To imply and enforce a contract to devise property under such circumstances

would give a waif, furnished a home, an advantage over a natural or adopted child.

Decree dismissing the bill of complaint is affirmed, with costs.

The claim of plaintiffs Groening and Ludwig that the trust instruments were void because of Mrs. Schmidt's mental incapacity to execute them was amply sustained by testimony. The trustee was wholly unknown to Mrs. Schmidt. The beneficiary McCambridge had had only a casual acquaintance with her. The execution of the instruments shortly after defendant McCambridge went to Mrs. Schmidt's home, the character of the trust, the lack of reason for it and the circumstances of its execution were not without significance. In addition, friends, neighbors, bankers, lawyers, doctors and business men who had had dealings or contact with Mrs. Schmidt were produced and related conduct which was convincing that she could not understand very simple business transactions, even the value of money, that she could not grasp ordinary conversation and that she was of extremely simple mind. While there was conflict in the testimony the trial court had the advantage of seeing the witnesses and its finding of mental incompetency coincides with the overwhelming impact of the written record.

Decree avoiding the trust instruments and for accounting affirmed, with costs.

North, Wiest, Butzel, Bushnell, Sharpe, Potter, and Chandler, JJ., concurred.