[No. 28298. Department One. April 6, 1942.]

E. I. DuPONT DE NEMOURS & COMPANY, INC., *Respondent*, v. ARTHUR M. GARRISON *et al.*, *Appellants*, GRANDVIEW INLAND FRUIT COMPANY, *Defendant.*[1]

[1]Reported in 124 P. (2d) 939.

*Cheney & Hutcheson,* for appellants.

*Bonsted & Nichoson* and *F. C. Palmer, Jr.,* for respondent.

DRIVER, J.—Plaintiff brought this action on a promissory note made by defendant Grandview Inland Fruit

Company, a corporation, and endorsed by defendant Arthur M. Garrison. A trial to the court resulted in a judgment in favor of the plaintiff and against all of the defendants except Loyola Garrison individually. Mr. and Mrs. Garrison, as a marital community, have appealed.

Appellants' assignments of error raise the question: Did the endorsement create a community liability or only a separate liability of the husband? They contend that the liability was separate for two reasons: (a) The stock of the corporation, all of which stood in the name of Mr. Garrison, had been purchased with his separate funds and property, hence was his separate property; and (b) that, at the time of the making of the note, the corporation was hopelessly and irretrievably insolvent and defunct; and, therefore, as the husband's endorsement could not possibly have resulted in any benefit to the community, it did not legally obligate the community.

There is no substantial dispute as to the pertinent facts. They will be brought out in our discussion of appellants' two contentions, which will be considered in the order stated.

First, was the stock of the defendant corporation community or separate property? Appellants were married in May, 1926. Since the beginning of the year 1925, Mr. Garrison had been engaged in the business of buying, selling, packing, and shipping fruit at Grandview, in Yakima county, first with a copartner, and then individually after dissolution of the partnership in the spring of 1926. At the time of the marriage, he testified, he had invested in this business approximately five thousand dollars in cash. Thereafter, he continued on an individual basis until late in 1927, doing a brokerage business for the most part. He used his cash resources to buy fruit, which he then resold,

but the scale of his operation was such that he found it necessary to borrow heavily from fruit companies on purchase contracts. His indebtedness at one time reached a total of forty-five thousand dollars. Sometimes, he made profits on transactions; at other times, lost "plenty." He handled several hundred car loads of fruit, and his capital turnover was rapid, " . : . it was turning every day some days," he testified. In carrying on the business, his original capital of five thousand dollars was combined with money borrowed from banks and other sources. During this period, neither he nor the community had any other source of income.

In the fall of 1927, Mr. Garrison had about five thousand dollars in cash, and, with this, he purchased one-third of the stock of a corporation named the C. F. Schaefer Company. In 1932, he exchanged this stock for the company's warehouse, packing equipment, and other properties at Grandview. At the same time, the defendant corporation was organized, and Mr. Garrison transferred all the Schaefer assets to the new company for one hundred and fifty shares (one-half) of its corporate stock. There was one other stockholder, who also held one hundred and fifty shares, but the corporation purchased his stock in 1935, and, except for one qualifying share, it was not reissued. Mr. Garrison was the president and manager of the defendant corporation and, from August, 1935, until February, 1938, he devoted his entire time to its service. His salary was one hundred and fifty to two hundred dollars a month. The promissory note which is the basis of the present action was a renewal of a prior note dated December 18, 1937, given to take up an open account for lead arsenate insecticide purchased by defendant corporation from the respondent in the spring of 1937.

■ Property owned by either husband or wife before marriage or acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is his or her separate property. Rem. Rev. Stat., §§ 6890, 6891 [P. C. §§ 1432, 1424]. All other property acquired after marriage by either spouse is community property. Rem. Rev. Stat., § 6892 [P. C. § 1433].

■ Property acquired by purchase during the marriage status is presumed to be community property, and the burden rests upon the spouse asserting its separate character to establish his or her claim by clear and satisfactory evidence. *Ballard v. Slyfield*, 47 Wash. 174, 91 Pac. 642; *Denny v. Schwabacher*, 54 Wash. 689, 104 Pac. 137, 132 Am. St. 1140; *In re Slocum's Estate*, 83 Wash. 158, 145 Pac. 204; *Seaton v. Smith*, 186 Wash. 447, 58 P. (2d) 830.

■ The status of property, either real or personal, is to be determined as of the date of its acquisition. *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937; *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673; *In re Binge's Estate*, 5 Wn. (2d) 446, 105 P. (2d) 689; *Conley v. Moe*, 7 Wn. (2d) 355, 110 P. (2d) 172, 133 A. L. R. 1089.

■ Separate property continues to be separate through all of its changes and transitions as long as it can be clearly traced and identified, and its rents, issues, and profits remain separate property. *In re Brown's Estate*, 124 Wash. 273, 214 Pac. 10; *Rogers v. Joughin*, 152 Wash. 448, 277 Pac. 988; *State ex rel. Van Moss v. Sailors*, 180 Wash. 269, 39 P. (2d) 397; *In re Binge's Estate, supra.*

The stock of the defendant corporation was acquired after the marriage of the appellants and, therefore, presumptively, was community property. To overcome the presumption, appellants sought to show

that the stock was purchased indirectly with the five thousand dollars separate cash which Mr. Garrison had at the time of his marriage in May, 1926. But can that fund *"be clearly traced and identified"* through all its changes and transitions? Particularly, can it be traced to, and identified with, the five thousand dollars which was used to purchase the stock of the Schaefer Company in the fall of 1927?

Appellants did not attempt to trace a connection through any specific, tangible property. On cross-examination, when asked "in what way" his separate capital had been invested, Mr. Garrison testified:

"Well, you got to have working capital, you know; that's principally what it was. Q. Well, was it invested in any fixed assets? A. Later it was; when I went in C. F. Schaefer Company, yes. Q. I mean, when you were in business in 1925 in Grandview, 1926, 1927. A. No, there wasn't much capital investment then. . . ."

Obviously, the money which was used to purchase the Schaefer stock was not the same money which Mr. Garrison owned in May, 1926. In the meantime, he had been operating a business which had substantially no assets or invested capital, other than cash, and one that, as was stated in *Salisbury v. Meeker,* 152 Wash. 146, 277 Pac. 376, "did not, within itself, have the potential power to produce rents, issues or profits." In a fruit brokerage enterprise, such as Mr. Garrison was conducting, the personal element is a very important one. His capital was converted from cash to fruit, and from fruit to cash, many, many times. There were substantial losses, followed by compensating profits. His separate property, consisting of five thousand dollars in cash, was indiscriminately mixed with borrowed funds, aggregating at one time forty-five thousand dollars, as has been stated. These funds,

borrowed after marriage, were not acquired by gift, bequest, devise, or descent, nor were they the rents, issues, or profits of separate property. Clearly, under the circumstances of the present case, such borrowings belonged to the community. 11 Am. Jur. p. 193, § 30, p. 220, § 69; and see *Main v. Scholl*, 20 Wash. 201, 205, 54 Pac. 1125; *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, *supra; United States Fid. & Guar. Co. v. Lee*, 58 Wash. 16, 107 Pac. 870; *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673; *Walker v. Fowler*, 155 Wash. 631, 285 Pac. 649.

So far as the record discloses, prior to the purchase of the Schaefer Company stock, no effort was made to conduct the fruit brokerage business as a separate entity apart from the affairs of the community, nor to segregate the husband's separate funds from the community funds. There was no separate bank account. The husband drew no set salary. How much was used for family living expenses or other community purposes is not disclosed. As the trial court remarked in its memorandum opinion: "The fact that Mr. Garrison possessed $5,000 at the end of 1927, which is the same amount that he had when he was married in 1926, is merely a coincidence."

This court has repeatedly and consistently held that, where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property. *Yesler v. Hochstettler*, 4 Wash. 349, 30 Pac. 398; *Doyle v. Langdon*, 80 Wash. 175, 141 Pac. 352; *In re Buchanan's Estate*, 89 Wash. 172, 154 Pac. 129; *In re Carmack's Estate*, 133 Wash. 374, 233 Pac. 942; *In re Gulstine's Estate*, 166 Wash. 325, 6 P. (2d) 628. The following language of *In re Carmack's Estate*, p. 380,

quoted from *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414, is equally appropriate here:

" 'Its separate and community natures have become so confused that the court cannot apportion them, and the favor with which community property is regarded and the presumptions in favor of it are such that we must agree with the trial court that these funds in bank are the property of the community. . . . ' "

On the phase of the case now under consideration, appellants particularly stress *Jacobs v. Hoitt, supra; In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10, *supra; State ex rel. Van Moss v. Sailors,* 180 Wash. 269, 39 P. (2d) 397, *supra.* All of them are factually distinguishable.

In the first case, the only property held to be separate was a proportional part of the plant and equipment of a bakery representing the investment of funds acquired and borrowed by the husband before marriage. It is interesting to note, moreover, that, after marriage, the profits of the bakery business on deposit in a bank were held to be community property for the reason that they had become so confused that their separate and community sources could not be traced and segregated.

In each of the other two cases cited, it was held that corporate stock remained separate property even though it had substantially appreciated after marriage, but it was either conceded or clearly established that the stock had originally been purchased by separate funds. In the *Van Moss* case, the court said, p. 276:

"If we consider the transfer simply as being a conversion of machinery and money into capital stock, then, of course, it has been clearly traced and is easily identified. If, on the other hand, we consider the stock merely as evidence of ownership of the paint and varnish business, including all of its assets, then, although the tracing and identification are not quite so immediate and direct, they are, nevertheless, under

the facts before us, still definite and positive. The property furnished by the Sailors ultimately went into the lot, the building, the machinery and equipment and supplies. What is left of the business, so far as the record shows, is of the same kind and character today. Moreover, what there is of it, they own. It is as capable of identification and division as was the property that went into it."

In the instant case, prior to the purchase of the Schaefer stock, the business in which the husband used his separate funds was not incorporated or otherwise conducted as a separate entity, and such funds were not invested in fixed assets or other traceable physical properties. Our conclusion is that the appellants have failed to overcome the presumption that the capital stock of the defendant corporation was community property.

We shall now consider appellants' second contention, namely, that, since the maker of the note was utterly insolvent and, in effect, in process of liquidation, the endorsement could not possibly have resulted in any benefit to the community and, therefore, created only a separate liability of the husband. The earlier note, of which the one in suit was a renewal, was signed December 18, 1937. The prior note also had been endorsed by Mr. Garrison. In passing upon appellants' contention, then, we must consider the situation of defendant corporation as of the stated date.

It is conceded by all concerned that the year 1937 was a most disastrous one for the fruit growers and for related lines of business. By December, 1937, the defendant corporation was heavily in debt, no doubt, but it is difficult to determine from the record just what its financial condition was at that time. Mr. Garrison testified that its indebtedness, over and above the value of the fruit in storage and everything else it had, was about fourteen thousand dollars, but, he

added, "At least, that's the way it liquidated out." The qualification is significant. The corporation had made extensive advances to growers for materials, production costs, and packing, and held growers' accounts receivable therefor, amounting to twenty thousand dollars. The total was ultimately reduced to eight thousand dollars by the sale of the 1937 fruit crop of the growers. "We had about 50,000 boxes of fruit in storage at that time," Mr. Garrison testified. Sale of this fruit was not completed until around June, 1938. No one could tell definitely in December, 1937, what would eventually be realized from the sale of the fruit then in storage—that depended upon the future behavior of a perennially erratic market. Mr. Garrison probably had this thought in mind when he wrote to respondent, with reference to the earlier note, under date of May 8, 1938, that

". . . it was at that time very uncertain as to what the apple market would do. It now appears certain that I will be unable to pay the note when due. The apples are going out at prices that just about pay storage and packing."

The defendant corporation continued to sell fruit during the winter and spring of 1938, and it did not finally close its warehouse until July of that year. It sold a small amount of spray materials to growers for cash in 1938. In a letter to respondent's northwest manager, dated April 11, 1938, signed "Grandview Inland Fruit Company By A. M. Garrison," this statement appears:

"Since writing to you last week, I was in Grandview Saturday and Sunday and have made arrangements with Mr. Cooper which alter our proposed set-up entirely. We have come to the conclusion that Mr. Cooper should continue operating the business and thereby maintain our place as a shipper in Grandview. This, of course, will depend entirely upon the attitude of the

creditors of the Grandview Inland Fruit Company and it is my hope that they will prefer to see the business operate rather than have it liquidated at this time. It is entirely probable that the season which is coming on will be entirely different from the one through which we have just passed and it is for this reason that *we have decided to continue the operation of the business."* (Italics ours.)

A note given, or an obligation incurred, by a married man for the benefit of a corporation in which he is a stockholder, binds his marital community if the corporate stock is the property of the community, and the test is whether the transaction is carried on for the benefit of the community. It is immaterial that the community actually derives no profit therefrom. *Way v. Lyric Theater Co.,* 79 Wash. 275, 140 Pac. 320; *Henning v. Anderson,* 121 Wash. 53, 207 Pac. 1048; *McNamara v. Gerbel,* 167 Wash. 56, 8 P. (2d) 1001.

In the *McNamara* case, a marital community owned forty-nine per cent of the stock of a corporation engaged in the construction business. It had lost heavily on two contracts and was engaged in the performance of a third when a trade acceptance for materials furnished fell due. The husband signed promissory notes covering the indebtedness as comaker with the corporation. The notes were dated February 1, 1924. A receiver was appointed for the corporation on March 10, 1924, and it was thereafter adjudged bankrupt. Holding that the notes constituted a community obligation, the court said, p. 60:

"The three notes were the obligation of the corporation. In that corporation, appellant husband had an interest to the extent of his salary and to the further extent of any profits available out of the contracts. 'The fact that no profit resulted is immaterial.' *Way v. Lyric Theater Co., supra.* It was to Gerbel's interest—he was a stockholder, secretary and business manager—that the corporation should not be pressed for

payment and thereby gain an extension of time of the payment of the trade acceptance. . . . Though the construction company was in fact insolvent, it was a going concern, as it continued to transact its ordinary business. It did not go into the hands of a receiver until about six weeks after the notes were delivered, and was not adjudicated bankrupt until March 24, 1924."

In the instant case, the appellants owned all the outstanding capital stock of the defendant corporation. It was purely a family enterprise. Any profits it might have earned would be community property. Mr. Garrison was its salaried manager. It is true that, on February 1, 1938, he took a full-time position with the state, and he had stopped drawing his salary from the corporation some time before that. Also, from March, 1938, to February, 1940, in recognition of what he apparently regarded as a moral obligation, he advanced in excess of four thousand dollars from his personal funds in payment of the corporation's debts. But the fact remains that, in December, 1937, the Grandview Inland Fruit Company was still doing business, and, under the circumstances then existing, we must conclude that Mr. Garrison was acting for the benefit of the community when he endorsed a note which extended the time of payment of one of the company's obligations.

Appellants rely principally upon the case of *Sun Life Assurance Co. v. Outler,* 172 Wash. 540, 20 P. (2d) 1110. There, a Mr. Kellough endorsed a note signed by his son-in-law, Outler, and his daughter. The note was given to a mortgagee in consideration of the release of its mortgage on land which was conveyed to the makers by the owner, a corporation. The contention was made that, since Mr. Kellough and his wife were stockholders of the corporation, the husband's endorse-

ment of the note created a community obligation. Answering the contention, the court said, p. 542:

"Because Kellough and wife owned a small amount of stock in the Attalia Vineyard Company, it is argued, on behalf of the appellant, that his endorsement of the note constituted the prosecution of a community enterprise, because, as stockholders in the corporation that conveyed the land to Outler, they were interested in the matter in a financial way. *The rule in mind is not applicable in this case, because the corporation did not give the note or receive, nor was it intended that it should receive, anything whatever out of the transaction. Indeed, it was not doing business at that time and had not been for some time, as all the parties to the transaction knew.*" (Italics ours.)

Clearly, the cited case is not in point here.

Judgment affirmed.

ROBINSON, C. J., STEINERT, MAIN, and BLAKE, JJ., concur.

