## TRUE et al. v. UNITED STATES.
### No. 312.

District Court, E. D. Washington, N. D.
Sept. 13, 1943.

Brown & Brown, of Spokane, Wash., for plaintiffs.

Edward M. Connelly, U. S. Atty., and Harvey E. Erickson, Asst. U. S. Atty., both of Spokane, Wash., and Thomas R. Winter, Sp. Asst. to the Chief Counsel, Bureau of Internal Revenue, of Seattle, Wash., for defendant.

SCHWELLENBACH, District Judge.

Plaintiffs, as the executors of the Estate of Burt A. True, deceased, seek a refund of a federal estate tax which they allege was wrongfully levied and collected. The property on the transfer of which the tax was assessed consisted exclusively of stock in True's Oil Company (hereafter called the Company). Decedent, who died on November 28, 1939, in Chicago, Illinois, following an attack of coronary thrombosis, resided in Spokane. He was survived by his wife Olive M. True, whom he married in 1904, by a brother Arthur L. True and three nephews and a niece, children of his brother. Decedent had never had any children.

The Company was organized in 1917. It engaged in the retail gasoline and oil business. It succeeded to the property and business of True's Oil Company, a copartnership consisting of decedent and his brother and his father. The copartnership had its beginning in Spokane in 1900. At that time it engaged in the sale of kerosene. Its assets consisted of two teams of horses, two wagons, a large number of tin cans and some storage facilities for kerosene. In the beginning, there was invested about $600 by the father and the two sons. The father ran the business and the two sons made the deliveries. The testimony is that when decedent was married in 1904 the business was worth approximately $2,000.

By the time the Company was organized on March 8, 1917, the value of the business had increased to such an extent that the corrected return showed a net worth, on December 31, 1917, of $111,995.17. Apparently, the formation of the corporation was motivated by the physical condition of decedent's parents. The mother died on March 16, 1917, and the father died September 18, 1917. At the time of its organization, the Company had an authorized capital stock of 25,000 shares of a par value of one dollar each. Of these, 10,000 shares were issued to L. L. True, the father, and decedent and his brother each received 7,500 shares. Simultaneously, the father's certificate was cancelled and certificates of 5,000 shares each were issued to decedent and his brother. On September 10, 1917, each of the brothers turned in his five thousand share certificate and new certificates were issued to each of them for 4,000 shares and certificates of 1,000 shares each were issued to the brothers' wives. During all of the time since the corporation was organized, the stock has been very closely held within the True family. With the exception of a small amount of stock issued to W. A. LaFontaine, sales manager of the Company, the stock originally authorized and that later authorized has been kept by the members of the family.

Sometime after the formation of the corporation, decedent and Arthur agreed that as Arthur's boys reached the age to assume responsibility in the business and had completed their education, each of the three boys would be given 5,000 shares of stock in the Company. Decedent's nephew Cecil finished his school work in 1928 and, a few months later, on September 18, decedent and his brother each transferred 2,500 shares to Cecil. Decedent's portion of the stock transferred came out of the 4,000 shares which he had retained out of his father's gift. In 1931, the nephew Lorenzo completed college and, on September 29, of that year, decedent and his brother each gave Lorenzo 2,500 shares. This transfer by decedent came out of his original seventy-five hundred share certificate. On October 11, 1933, the authorized capital stock of the Company was increased by an additional 2,500 shares of non-voting stock. Sales of the new stock took place in 1934, 1935, 1936 and 1937, the purchasers being the then stockholders of the corporation and Mr. LaFontaine. The wives of decedent and his brother paid for their new stock with the dividends they received from their old stock. Decedent and his brother paid for their new stock partly with dividends received from their stockholdings and partly with credits set up for undrawn salaries.

In the spring of 1939, decedent's youngest nephew Paul completed his college work and returned to Spokane to take his place in the business of the Company. Unfortunately, Paul acquired at college not only an education but also a wife whom he brought to Spokane. His marriage terminated unsuccessfully in an Idaho divorce sometime in the fall of 1939. Although Paul's work with the Company was entirely satisfactory, his matrimonial failure cast some doubt in the minds of his father and uncle as to the efficacy of giving to him outright the 5,000 shares of stock which had previously been agreed upon for each of the boys. Consequently, on November 15, 1939, the decedent and his brother each transferred 2,500 shares to Cecil and Lorenzo, as trustees, with a very loose understanding as to when and if it would later be transferred to Paul. Decedent's portion of this transfer came from what was left of his original seventy-five hundred share certificate.

Shortly thereafter, decedent arranged a trip. He purchased a Buick automobile to be delivered to him at Flint, Michigan. He planned on travelling that far by train and then, with his wife, taking a long automobile tour throughout the eastern states. Just before arriving in Chicago, he suffered a heart attack from which he died on November 28, 1939. Plaintiff's estate tax return was not accepted by the Commissioner. He rejected the contention that decedent's wife's 1,000 shares received by her in 1917 were her separate property. He determined that the 2,500 share transfer to the trustees should be included in the gross estate for the reason that (1) a complete gift was not made at that time nor at any time prior to the date of death; (2) the transfer was made in contemplation of death; and (3) such transfer was made to take effect at or after death. He concluded that 47 per cent of all of the stock held in the names of decedent or his wife was decedent's separate property upon which a tax must be paid and that decedent's wife was only entitled to claim 27 per cent of the total stock as her share of the community property. He concluded that the stock should be valued at $10 per share

which was $2.50 per share in excess of the amount at which it was valued in plaintiff's return. After reaching these conclusions, the Commissioner assessed the tax upon the basis of them and the tax was paid and this action is for its refund. The case divides itself into four separate and distinct questions. In discussing each, it will be necessary to point out additional facts pertinent to each issue.

 The reasoning behind the Commissioner's ruling on the question of the community or separate character of the original 7,500 shares and stock later purchased with the increments therefrom was outlined by defendant's expert upon the stand. It was purely theoretical. In it, defendant made no effort to square its theory with the facts of this case. It completely ignored the law of the State of Washington. Briefly stated, the theory was this: A partnership interest is separate and apart from the partnership assets and upon the sale of such an interest, the gain has been held to be a capital gain. The growth of a business is very rarely due to the efforts of one partner. The efforts of other partners cannot be regarded as a result of the community effort of the first partner. In partnership business, the capital and market value of the credit used are not community contributions in making the profits. Therefore, any enhancement in the value of the capital assets of a partnership cannot be considered a community contribution. On this basis, the Commissioner arbitrarily divided the 7,500 original shares 50 per cent community and 50 per cent separate. He carried this division all the way through in his calculations. I am convinced that the 7,500 shares received in 1917 were all community property. When these three partners started out in 1900 peddling kerosene from their two wagons in Spokane, this city had a population of 36,848. The city directory for Spokane in 1902, which was the first one printed after the Trues started business, showed them doing business as the "Pacific Oil Company" selling "illuminating oil." In other words, they were engaged in the business of selling kerosene to people who wanted to use kerosene in lamps. By the time the corporation was organized in 1917, it was engaged in an entirely different business, that of selling gasoline and oils to the owners of automobiles. There were very few automobiles in Spokane between 1900 and 1904. The 1902 city directory shows only one concern dealing in automobiles, the chief business of which was selling bicycles. It is a well-known fact that it was not until 1908 when Henry Ford started the mass production of his Model T cars that there was enough automobile business in Spokane to support any oil or gasoline dealer. Any assets that the old Pacific Oil Company partnership may have had at the time of decedent's marriage could have contributed little more than nothing to the oil business of True's Oil Company which was changed into a corporation in 1917. No doubt, between 1900 and 1904, the father and the two sons established a reputation for honesty, fair dealing and integrity. They, however, could have established that if, instead of having a place to keep kerosene in the back yard, the mother had baked bread in the kitchen and the boys had peddled bread around the streets of Spokane. Probably very few of the concern's lamp users became auto owners during these years. To say that 50 per cent of the value of decedent's interest in this business, as incorporated in 1917, had been conceived prior to 1904, is to fly directly in the face of all of the facts either shown in the record or so notoriously known to everybody that they must be judicially noticed. It is true the same persons continued a partnership but there was no relationship between the business incorporated in 1917 and the business operated in 1904.

 " 'Courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved.' * * * The rule just stated is of peculiar importance in tax cases; for, unless the courts are very careful to regard substance and not form in matters of taxation, there is grave danger on the one hand that the provisions of the tax laws will be evaded through technicalities and on the other that they will work unreasonable and unnecessary hardship on the taxpayer." Western Maryland R. Co. v. Commissioner, 4 Cir., 33 F.2d 695, 698. In the consideration of this question, I am entitled to turn to the state law in determining what is community and what is separate property. Poe v. Seaborn, 282 U.S. 101, 108, 51 S.Ct. 58, 75 L.Ed. 239. The status of property is to be determined as of the date of its acquisition. Heintz v. Brown, 46 Wash. 387, 90 P. 211, 123 Am.St.Rep. 937; Katterhagen v. Meister, 75 Wash. 112, 134 P. 673; In re Binge's Estate, 5 Wash.

2d 446, 105 P.2d 689; Conley v. Moe, 7 Wash.2d 355, 110 P.2d 172, 133 A.L.R. 1089. Where the separate and community nature of property has become so confused that the court cannot apportion them, the favor with which community property is regarded and the presumptions in favor of it are such as to require the court to hold such property to be community. Jacobs v. Hoitt, 119 Wash. 283, 205 P. 414; In re Carmack's Estate, 133 Wash. 374, 233 P. 942; In re Gulstine's Estate, 166 Wash. 325, 6 P.2d 628. When stock in a corporation is purchased after marriage, it is presumptively community property. This presumption can only be overcome by tracing and identifying it clearly to an original, separate right. DuPont de Nemours & Co. v. Garrison, 13 Wash.2d 170, 124 P.2d 939. So parallel are the facts in the Garrison case as to justify a brief outline of them here. Garrison, first as a copartner with another and then as an individual, was engaged in the business of buying, selling, packing and shipping fruit. In May, 1926, he married. He testified that at the time of his marriage his business was worth $5,000. He carried on that business after being married. He had certain ups and downs during the next few months but, in the fall of 1927, he took his five thousand dollars and bought a one-third stock interest in a corporation. In 1932, he exchanged this stock for stock in another corporation. In 1937, he endorsed the promissory note of the corporation. The question in the case was whether or not the community of Garrison and his wife was liable. The Garrisons disclaimed liability on the ground that the stock in the corporation was Garrison's separate property. The court held the stock to be community property and the community liable on the note.

■■■■ The next question involves the transfer of 2,500 shares to the trustees. I see nothing in that transaction indicating that it was in contemplation of death or was made to take effect at or after death. Defendant's counsel is in error in his brief when he asserts that decedent was in ill health at the time of this transfer. Decedent's personal physician, a reputable practitioner in Spokane, testified that decedent had, almost without exception since 1921, come to his office every six months for check-ups. Apparently, decedent was one of the early converts to that theory of health insurance. The doctor read into the record the detailed reports of these semi-annual examinations. They showed nothing to indicate a heart condition pointing towards coronary thrombosis. Decedent's blood pressure was normal during all of this time. I asked the doctor if, in the dozens of examinations, he had ever taken electro cardiograms. His answer was that he saw nothing to indicate any necessity for the taking of such pictures. It is true he went to the doctor's office just before he left on this trip. He went there in the same way as he had gone every six months previously. Just prior to that time he had taken his annual strenuous hunting trip and there was nothing in his actions while on the trip or revealed in his examination after the hunting trip which showed any ill effects. He had arranged to pick up a car in Flint, Michigan, and drive on a strenuous schedule throughout the East. No man fearing death from heart attack makes such arrangements. I am convinced that the transfer of the 2,500 shares for the benefit of Paul was exclusively the result of the agreement with his brother concerning the transfer to decedent's nephews. The law on this question still remains as it was laid down by the Supreme Court in United States v. Wells, 283 U.S. 102, 117, 51 S.Ct. 446, 75 L.Ed. 867. See Colorado National Bank v. Commissioner, 305 U.S. 23, 27, 59 S.Ct. 48, 83 L.Ed. 20. In the Wells case [283 U.S. 102, 51 S.Ct. 451, 75 L.Ed. 867], the Supreme Court said: "As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death. But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and

the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor." The very illustration given by the Supreme Court in the Wells case is applicable here. "As illustrating transfers found to be related to purposes associated with life, rather than with the distribution of property in anticipation of death, the Government mentions transfers made 'for the purpose of relieving the donor of the cares of management or in order that his children may experience the responsibilities of business under his guidance and supervision.' "

 However, the fact that this was not a gift causa mortis does not relieve the estate from the payment of the tax. The stock was transferred to Cecil and Lorenzo in trust upon their giving a receipt which read: "The duration of said trust is to be for five years or such further period as the trustees may deem beneficial and necessary." The testimony of both Cecil and Lorenzo was extremely indefinite as to their responsibility under the trust. They both conceded that they had the right to continue the trust indefinitely. When, in examining Lorenzo, I asked him concerning certain eventualities, his answer was that they "would cross those bridges when they came to them."

A gift either inter vivos or causa mortis must be in praesenti. Sturgis v. McElroy, 113 Wash. 192, 193 P. 719. "The donor must intend to relinquish the right of dominion on the one hand, and to create it on the other, and the intention to make a gift must be a present intention; a mere intention to give it in the future will not suffice. 24 Am.Jur., p. 738, sec. 721." Roesch v. Gerst, Wash., 138 P.2d 846, 850. "Gifts inter vivos have no reference to the future and go into immediate and absolute effect. In order to be effectual a gift inter vivos must be fully executed. If anything remains to be done, the transaction is a mere executory agreement to give, and title does not pass. One of the requisites to a valid gift inter vivos is the delivery of the thing given, and the delivery must be such as to vest the donee with control and dominion over the property and to absolutely divest the donor of his possession and control. Until such delivery has been made, title to the property does not vest in the donee." Union Trust Co. v. United States, 54 F.2d 152, 155, 73 Ct.Cl. 315. Here the

stock was transferred to the trustees with indefinite, oral instructions which amounted to giving them discretionary power of determining when, if ever, the delivery to Paul should be made. The plaintiffs were just as much trustees for the decedent and his estate as they were for Paul. Consequently, there was no completed gift and the estate tax upon the 2,500 shares was properly assessed.

 The third question involves valuation. The plaintiffs, in their return, fixed a valuation of $7.50 per share. They support that by deducting from the $9.70 book value as of the date of death the sum of $1.40 per share resulting from a reappraisal of real estate by which the total book value was reduced in the sum of $59,030. They then assert that the highly competitive nature of their business justified a further deduction of 80¢ per share. The Commissioner supports his $10 per share valuation by showing certain sales of stock in 1937 at $9 per share, then adding to that the sum of $1.16 per share which is the increase in the book value between 1937 and the date of death. I cannot accept either theory. The plaintiffs are not entitled to pick out one isolated item among the corporation's assets, reappraise that and then ask for a readjustment of the book value of the stock. I have no way of knowing the correctness or incorrectness of any of the various items carried upon the corporation books. If one was overvalued, other items may have been undervalued. A taxpayer attempting to lower tax liability by readjustment of book value must submit a reappraisal of all of the corporation's property and cannot rely upon one isolated item.

 Had the defendant rested there, the Commissioner's determination would control. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367. But the defendant produced the evidence of its expert as to the process by which the commissioner arrived at his determination. Evidence having been so produced, the presumption ceased, and thenceforth the issue depended "wholly upon the evidence." Hemphill Schools, Inc., v. Commissioner, 9 Cir., 137 F.2d 961, decided Aug. 26, 1943; J. M. Perry & Co. v. Commissioner, 9 Cir., 120 F.2d 123, 124; San Joaquin Brick Co. v. Commissioner, 9 Cir., 130 F.2d 220, 225; Ariasi v. Orient Ins. Co., 9 Cir., 50 F.2d 548, 554, in which the court cited with ap-

proval Hunter Glover Co. v. Harvey Steel Products Corporation, D.C., 3 F.2d 634, 639, as holding that: " * * * the presumption * * * disappears when proof to the contrary is offered by either party." New York Life Ins. Co. v. Gamer, 303 U.S. 161, 58 S.Ct. 500, 503, 82 L.Ed. 726, 114 A.L.R. 1218 (cited in Hemphill Schools, Inc., v. Commissioner, supra), in which the Supreme Court said: " * * * the jury is required to consider all admitted and proved facts and circumstances upon which the determination of that issue depends * * *."

 The defendant has no right. to take the high selling price of the stock in 1937 and use it as the base to which it adds an increase in book value during the two-year period. This stock was not listed nor was it dealt in. Inter-family transactions have been held to merit little if any weight in determining the value of market value of stock. Law of Federal Income Taxation, Mertens, Sec. 59.23. Mathilde B. Hooper, Adm'x v. Commissioner, 41 B.T.A. 114. If sales in the market are to prove value, they must have been made at or about the time as to which the value is to be determined. Appeal of Julius G. Day et al., 3 B.T.A. 942. This rule is peculiarly applicable here because the record discloses that, in the year 1937, the net income of the corporation exceeded by over 100 per cent the highest net income the corporation had ever made since its formation. I cannot follow the reasoning of the defendant that it is entitled to take the highest sale price of the stock and then take the increase in book value and combine the two in arriving at value for tax purposes. The testimony of the defendant is that two weeks prior to death, the value of this stock was $9.70. It is upon that basis that the tax should have been assessed.

 The 1,000 shares received by decedent's wife in September, 1917, and the shares purchased by dividends from it are her separate property. She received the dividends from it. She purchased the new stock allocated to it. Defendant asks me to assume that it was issued to her in order that she might qualify as a corporation director. This is answered by the fact that the corporate by-laws only authorized three directors and that a similar 1,000 shares was issued to Arthur's wife at the same time. A much less violent assumption would be that the old father eight days before his death asked that each of his sons make a 1,000 share gift to his wife. Disre-

garding all assumptions, the wife received this stock by gift. Property acquired by gift is separate property. Rem.Rev.Stat. §§ 6890, 6891. Separate property continues to be separate property as long as it can clearly be traced and identified and its rents, issues and profits remain separate property. In re Brown's Estate, 124 Wash. 273, 214 P. 10; Rogers v. Joughin, 152 Wash. 448, 277 P. 988; In re Binge's Estate, 5 Wash.2d 446, 105 P.2d 689. "We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is. with actual command over the property taxed.'" Griffiths v. Commissioner, 308 U.. S. 355, 357, 60 S.Ct. 277, 278, 84 L.Ed. 319: Mrs. True exercised command and control over this stock. Had a dispute arisen over taxing on the dividends from it, defendant would have insisted upon taxing her for them. Mertens Law of Federal Income Taxation, Sec. 19.16; Rem.Rev.Stat. of Wash. §§ 6890, 6891. It cannot now claim the right to lump this stock in with the other on its fifty-fifty division theory.

Judgment will be entered for plaintiffs. for the amount which computations based. upon this opinion justify.