Cecil V. Gray v. Commissioner.
Gray v. Commissioner
Docket No. 2905.
United States Tax Court
1945 Tax Ct. Memo LEXIS 163; 4 T.C.M. (CCH) 743; T.C.M. (RIA) 45236; June 13, 1945
*163 F. A. LeSourd, Esq., for the petitioner. Douglas L. Barnes, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined deficiencies in income tax for the calendar years 1940 and 1941 in the respective amounts of $1,255.98 and $7,565.29. One adjustment involving the deduction to be taken in connection with the rental of a postage meter, has been settled. Another, involving a claimed loss of $100 in connection with stock of a mining company, which petitioner claimed became worthless during the calendar year 1941, was resolved against him at the close of the evidence. The principal issue is whether the income of a business conducted by petitioner was community income, separate income, or both. If both, then the percentage of each must be determined. Most of the basic facts have been stipulated and by this reference are specifically found. Others shown in our findings are based upon evidence adduced at the trial. Findings of Fact Petitioner is a resident of Seattle, Washington, and filed his income tax returns for the taxable years with the collector of internal revenue for the Washington district. His *164 wife, Mary Edna Gray, to whom he was married on December 22, 1937, filed a similar return in the office of the same collector. In each return one-half of the net profit from a business conducted under the name of Gary Lumber & Shingle Co. was included in gross income and each of the parties claimed identical deductions. At the time of petitioner's marriage to his present wife he was the sole proprietor of Gray Lumber & Shingle Co., - a trade name and not a legal entity - with offices in Seattle. The business was a wholesale brokerage business of lumber and shingles. The business had been established by petitioner's father. Petitioner entered it with him in 1917, at which time the present name was adopted. Petitioner was then 25 years of age. Petitioner's father died in 1925 and since that date the business has been operated entirely by him. Petitioner had been married previous to his marriage to his present wife, and two children were born the issue of that marriage. During the years preceding petitioner's second marriage the business was moderately successful. It was carried on substantially as follows: Lumber and shingles were purchased in carload lots on credit terms of *165 fifteen days, placed immediately in shipment and the sales to customers were usually completed within about a week from the date of the purchase. Upon making the sales the accounts were pledged with local banks to secure loans and the proceeds of the loans were used to pay for the merchandise purchased, including handling and shipping charges. The bank loans were discharged upon receipt of payments from the purchasers, the purchasers usually remitting directly to the bank. The loans were evidenced by notes signed by petitioner, secured by pledge of the accounts. The merchandise inventories, shown in the balance sheets attached to the stipulation, consisted largely of shingles. Such merchandise was usually carried on the books for a period of approximately seven days. No warehouses or storage yards were maintained. The business was carried on from a central office in Seattle, petitioner devoting all of his time to it but being assisted by bookkeepers, clerks and stenographers. The salaries paid to others than petitioner ranged from $12,000 in 1937 to $21,000 in 1940 and $30,000 in 1941. Office supplies and expenses, commissions, telephone and telegraph, traveling, and similar expenses *166 aggregated from $15,000 to $30,000 per year. The profit and loss of the business for the ten year period 1928 to 1937, inclusive, before any withdrawals by, or salary advances to, petitioner, had averaged $6,718 per year. During the same period petitioner's withdrawals from the business for personal uses had averaged $11,970 per annum. During the years 1938 to 1941, inclusive, the earnings of the business and the withdrawals for personal use by the petitioner were as follows: Proprietary
Interest at
With-
Close of
Year
Earnings
drawals
Year
1938
$12,146.53
$14,213.31
($22,770.81)
1939
6,059.49
16,297.68
(33,009.00)
1940
18,140.31
12,287.13
(27,155.82)
1941
39,082.08
12,882.44
(896.58)
Of the withdrawals shown above the following amounts were for purposes relating to separate property or obligations of petitioner: 1938
$5,211.08
1939
4,590.01
1940
4,606.26
1941
4,511.28
A comparison of some of the other items shown on the balance sheets and profit and loss statements may be made from the following schedules: Percent of
Cost of
Cost of
Year
Gross Sales
Goods Sold
Sales to Sales
Net Income
1937
$ 863,178.88
$ 819,509.23
94.9
$10,000.26
1938
1,019,594.87
973,574.59
95.5
12,146.53
1939
1,313,178.52
1,263,169.99
96.2
6,059.49
1940
1,714,867.20
1,640,224.42
95.6
18,140.31
1941
2,055,458.53
1,942,913.26
94.5
39,082.08
*167 Year ended
Trade Accounts
December 31
Receivable
Inventories
1937
$ 75,197.17
$24,041.09
1938
103,025.23
19,763.70
1939
106,128.47
29,651.49
1940
133,532.54
40,865.34
1941
128,018.95
51,119.08
Amounts Owing at End of Year (including both obligations incurred before and obligations incurred after marriage) Year Ended
To
Trade Accounts
Dec. 31
Relative
To Banks
Payable
Totals
1937
$29,019.30
$61,515.40
$29,702.82
$120,237.52
1938
30,988.52
84,936.74
27,343.87
143,269.13
1939
34,693.06
89,749.56
28,365.63
152,808.25
1940
35,721.66
99,976.85
55,296.15
190,994.66
1941
34,168.60
75,237.73
57,567.35
166,973.68
Discounts
Discounts
Earned for
Allowed for
Prompt
Prompt
Year
Payment
Payment
1937
$16,576.94
$14,971.14
1938
19,652.87
16,263.09
1939
25,475.05
23,201.75
1940
33,263.65
30,734.95
1941
39,543.37
36,173.28
Salaries
and Wages
Total Yearly
Included
Year
Expenses
Therein
1937
$29,941.99
$12,205.71
1938
30,195.53
13,021.35
1939
37,781.90
16,581.94
1940
37,889.89
21,077.51
1941
65,597.91
30,222.20
*168 During the taxable years the business was carried on with an established clientele, principally through contact by mail, telegraph and telephone. Prior to 1938 sales had been made through salesmen working on a commission basis. Many of the customers had continued to do business with petitioner's company because of his personal relationships with them through correspondence and periodic visits. In 1941 the business had 500 customers, approximately fifty percent of whom had been making purchases from it for a period of ten years. Since 1942 petitioner has been receiving $12,000 per annum for acting as the Seattle Branch Manager of the Associated Shingle Buyers of Wichita, Kansas, devoting approximately 2/3rds of his time to such work. The balance of his time since 1942 has been spent in managing his own business, the volume of which has been curtailed. The balance sheet of the business at the time of petitioner's marriage to his second wife was as follows: ASSETS
Current Assets:
Cash due from bank
$ 5,849.55
Accounts Receivable, Trade
$ 85,463.09
Less Guaranteed Freight
10,265.92
75,197.17
Less Valid Discounts
1,002.84
74,194.33
Claims, Freight
779.61
Other Accounts Receivable
369.90
75,343.84
Less Reserve for Bad Debts
2,934.91
72,408.93
Inventory: 40 cars shingles
24,041.09
Deferred expenses
349.00
Total Current Assets
$102,648.57
Fixed Assets:
Timber Tract Contract
4,726.29
Automobile
1,175.00
Less Reserve for Depreciation
900.00
275.00
Equipment, Office
2,701.67
Less Reserve for Depreciation
1,622.54
1,079.13
TOTAL ASSETS
$108,728.99
LIABILITIES: Current Liabilities:
Checks Outstanding
$ 5,980.10
Notes Payable, Nat'l Bank of Commerce, including interest
61,515.40
Accounts Payable, Trade
29,702.82
Accrued Expenses
979.39
Total Current Liabilities
$ 98,177.71
Other Liabilities:
Notes Payable to Relatives
29,019.30
Suspense Items, Undercharges, etc.
6,036.01
TOTAL LIABILITIES
$133,233.02
PROPRIETORSHIP: C. V. Gray - Deficit
$ 24,504.03
Total Liabilities and Proprietorship
$108,728.99
*169 Paragraph IV of the stipulation is as follows: "Of the total of $75,197.17 in Trade Accounts Receivable (less guaranteed freight) shown on the Balance Sheet of Gray Lumber and Shingle Company for December 31, 1937, $67,030.82 was on the date of the balance sheet assigned to the National Bank of Commerce, Seattle, Washington, as security for the notes payable to that Bank totaling $61,515.40 shown as a current liability on said balance sheet. The obligors of these accounts receivable remitted their payments directly to the Bank and the Bank applied said payments against said notes payable. The entire $61,515.40 of notes payable to the Bank on December 31, 1937 were satisfied during the year 1938 from payments received directly from obligors of the accounts receivable which were assigned to the Bank on or before December 31, 1937, except for the sum of $1,587.65 paid to the Bank by Gray Lumber and Shingle Company from other funds. "All of the other current liabilities shown on the December 31, 1937, balance sheet were paid during the year 1938 from the assets of the business, except the sum of $920.67 which was never paid because never claimed by the creditors involved. Payment to *170 the extent of $660.32 of these current liabilities was made by a reduction in that amount of the Timber Tract Contract Receivable shown as a fixed asset on the December 31, 1937 balance sheet." In addition to borrowing from banks petitioner also borrowed from relatives. At the time of his marriage in 1937 he was indebted to relatives in the aggregate amount of $29,019.30. Additional amounts were borrowed during later years as shown in one of the schedules set out above. Reasonable compensation for petitioners' services as the manager and active head of the Gray Lumber & Shingle Co., during each of the taxable years was $15,000. In 1929 (possibly 1928) petitioner purchased 10 shares of stock in the Swauk Mining and Dredging Co. for $200. The company owned mining properties near Ellensburg, Washington, which for a number of years had been operated under lease by the Kittilas Gold Mining Co. The operations were not profitable and when the lease was terminated no new lessee could be secured. The stockholders throughout the years had advanced various sums of money to the corporation, accepting its notes, payable at the end of a three year period, with interest at 10 percent per *171 annum. Petitioner had one such note in 1936 in the amount of $496.38, issued to replace an old one. In August of 1937 the company did not have enough funds to pay its current expenses, such as corporation license fees, taxes, etc., but some of its officers advanced sufficient [capital] to prevent it from losing its property. During 1938 to 1939 letters of inquiry, addressed by petitioner to the company with reference to prospects of payment of the note referred to above, were unanswered. In November of 1939 petitioner prepared a renewal note and sent it, with a letter, to the company. No response was made to that letter or to several subsequently written; however, under date of July 6, 1940, an offer was made to execute a new note to petitioner for a lesser amount and bearing a lower rate of interest. Whether this was ever done has not been shown. The letter stated that there "has always been some question if the large amount of indebtedness could be completely paid." The reason assigned in the letter for the reduction of interest was that "many thousands of dollars" had been advanced and the stockholders were fearful the action of the directors in allowing 10 percent interest *172 "would eventually completely engulf the total estimated value of the Swauk property and more too, and nothing would be left, in the event of further activity, for the stock." A later letter in July of 1940 indicated there might be some possibility the notes would be paid ultimately. In the returns of petitioner and his wife for 1941, prepared on a community basis, $200 - $100 in each return - was deducted as a stock loss. The stock had no value at the beginning of and throughout the year 1941. Opinion The last finding which has been made is dispositive of the minor issue involving the claimed stock loss. The Commissioner held that the stock did not become worthless in 1941. Laying to one side the presumption of correctness attaching to his determination, the evidence adduced by the petitioner confirms rather than refutes it. No error has been shown in the denial of the claimed loss. The main issue poses a more difficult question. Petitioner, adopting the premise that the income realized in the taxable years was derived solely from and attributable to his personal services, performed on behalf of the community, has included in his gross income one-half of the earnings or profits *173 of the business, an equal amount being included in the gross income of his wife. Respondent has taken the position that petitioner had "acquired the business prior to his remarriage in 1937" and that "only that portion of the business profits representing a reasonable salary can be construed as community income." He determined such reasonable compensation to be 20 per centum of the net profits of the business. Both parties suggest possible alternatives which, although bringing them a little closer together, still leaves them quite far apart. Respondent's alternative is that the additional amount borrowed by petitioner from his relatives after marriage ($7,573.70), and used in the business during the years 1938 to 1941 might be deemed to be an investment of community credit under the rationale of Jacobs v. Hoitt, (Wash. 1922) 205 Pac. 414, although he suggests it was such an insignificant factor that it should be disregarded. In re Binge's Estate, 5 Wash. (2d) 446, 105 Pac. (2d) 689. Petitioner's alternative, also recognized by respondent as a possible "suggested guide" but which, he says, is to be applied only where the facts are such as to make it reasonable, *174 is a computation under G.C.M. 9825, Vol. X, 2 C.B. 146. In this connection petitioner assumes a return on capital of 8 per cent, the capital recognized by him consisting only of an automobile, the furniture at its depreciated value and the remaining accounts receivable shown on the books as owned by him at the time of his marriage. The aggregate capital thus computed is $1,310. He also assumes $18,000 to be the fair value of the services rendered by him for the business. Thus, he, applying the formula suggested in the G.C.M., arrives at a determination that 99.42 per centum of the net income for 1940 and 99.47 per centum of the net income for 1941 was community income. It is obvious from the stipulated facts, explained and elaborated upon by the testimony of petitioner, that some part of the income in issue resulted from the business which he owned at the time of his marriage but that a substantial part of it resulted from his personal labor, skill and industry. The business had not been incorporated nor was it, after the death of petitioner's father, carried on as a partnership. Petitioner owned it outright. Books of account were kept, reflecting its accounts, *175 as the magnitude of its operations required. Its gross income was substantial and it continued to thrive notwithstanding the fact that petitioner frequently withdrew from it funds in excess of his indicated proprietary interest. It is clear that his full-time activities and the management and skill which he devoted to the business were responsible for most of its income. We have no hesitancy in holding, therefore, that the Commissioner erred in determining that but 20 per centum of the net income of the business represented community income under the laws of Washington, where he was domiciled. In the recent case of Lawrence Oliver, 4 T.C. No. 684, a California taxpayer resisted the Commissioner's determination that the fair and reasonable compensation for his services in the conduct a business was the proper measure of the community income, the remainder of the income being attributable to capital. It was held that the income from the business for the taxable years 1938 and 1939, then before us, should be apportioned between the capital invested and the taxpayer's services; that the capital should be determined by allocating between separate and community income the *176 earnings of the business from July 29, 1927, (the effective date of section 161(a) of the Civil Code of California) to the first of January 1938; that the apportionment to capital should be an amount equal to 7 per cent of the capital; and that the remainder of the income over and above the 7 per cent of the capital should be apportioned to petitioner's services in conducting such business. See also Guy C. Earl, Jr., 4 T.C. 768. The cited cases are in substantial accord with G.C.M. 9825, supra. They therefore tend to support the alternative computation suggested by petitioner. Both parties correctly point out, however, that the law of the domicile, as construed by the highest court of the state, determines the character of the income as separate or community. Poe v. Seaborn, 282 U.S. 101. Citing numerous Washington cases - largely the same ones - counsel for the parties reach diametrically opposite conclusions. We find ourselves more nearly in accord with that of petitioner. We will, however, review briefly respondent's theory. Pointing out that petitioner's withdrawals during preceding years had been in excess of the earnings of the business *177 he concludes that the deficit in business capital had not been due to operating losses. Considering the fact that the business had existed for a number of years, that it had an established line of credit which permitted it to function profitably notwithstanding the fact that it had no capital, that the volume of its business "depended to a great extent upon its established reputation and clientele," that the nature of the business "was such that the use of petitioner's separate borrowed capital was a vital factor" in the production of the income, and that by the use of credit and borrowed capital the business had been able to earn substantial discounts in each of the years, he urges that capital had been "an important element in the earnings of the business." Although the term itself does not appear in respondent's argument the suggestion seems to be implicit that good will and other intangible assets built up throughout the years should be construed to be capital and separate property of petitioner, owned by him at the time of his marriage and thereafter kept separate. So far as we have been able to ascertain the courts of Washington have never approved any such theory. One of *178 the most recent summations of the rules to be applied in determining what is separate and what is community property in the State of Washington is contained in In re Witte's Estate, (Supreme Court of Washington, July 5, 1944) 150 Pac. (2d) 595. Numerous authorities are there cited, which, for present purposes need not be set out. The rules, in the language of the court, are: (1) Property and pecuniary rights owned by either husband or wife before marriage or acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, are his or her separate property; and all other property acquired after marriage by either spouse is community property. * * * (2) The status of property, whether real or personal, is to be determined as of the date of its acquisition. * * * (3) The status of property, when once fixed, remains so in character until changed by deed, by agreement of the parties, by operation of law, or by the working of some form of estoppel. * * * (4) Separate property continues to be separate property through all of its changes and transitions so long as it can be clearly traced and identified, and its rents, issues, and profits *179 likewise are and continue to be separate property. * * * (5) Property acquired by purchase during the marriage status is presumed to be community property, and the burden rests upon the spouse asserting its separate character to establish by clear and satisfactory evidence his or her claim to the contrary. * * * (6) Where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property. * * * (7) The rule last above stated is subject to the qualification that when the community property is inconsiderable in comparison with the separate property, the mass remains separate property. * * * Respondent impresses upon us the necessity of keeping in mind the distinction between the two situations discussed in the above case, pointing out that where tracing is possible an allocation will be made and it is only when a commingling has made tracing impossible that the property will be held to be community. He also urges that any presumption which might be indulged in under local law does not serve to dispel the equally strong presumption with which *180 his determination is clothed. Cf. Herbert L. Damner, 3 T.C. 638; J. Z. Todd, et al., 3 T.C. 643. We have kept the distinction in mind; but as we view the present facts there need be no weighing of presumptions or application of the principle of the last-cited cases. Decision may be rested upon the ground that the separate property of petitioner at the time of his marriage was insignificant and only a small factor in the realization of the income in issue. Assuming, for present purposes, that we may, even in the absence of any evidence specifically directed to the question, attempt to evaluate the good will and other intangibles of the business, we hesitate to attribute any value to them. In this connection it may be pointed out that although the business might have had some intangible value in the taxable years, based upon the application of a formula capitalizing earnings, it is difficult to see how any substantial value could be attributed to it during the period preceding the marriage. At that time, according to the balance sheets, the deficit brought about by petitioner's withdrawals in excess of earnings, amounted to more than $24,000. In other words, *181 for a period of ten years, petitioner had drawn several thousand dollars more each year than the net earnings of the business amounted to. Petitioner has requested a finding that the withdrawal during each of the earlier years was reasonable compensation for the services rendered while respondent has requested a finding that the amount earned during each year, as shown by the books, represented the maximum value of such services. The evidence does not leave us with any abiding conviction either way; so we have refrained from making any finding. This much, however, is clear - no showing has been made that the good will and intangibles of the business had any value at the time of the marriage. In a comparatively recent case decided by the Supreme Court of Washington - DuPont De Nemours Co. v. Garrison, 124 Pac. (2d) 939 - the issue was whether a note signed by the husband for the benefit of a corporation in which he owned all of the stock was a community or separate liability. The husband owned separate property at the time of his marriage and undertook to prove that the stock had been purchased with the cash which he had at that time. He had been engaged in a fruit brokerage *182 enterprise, conducted substantially as petitioner's business in the instant case was conducted. The court pointed out that the personal element was "a very important one," saying: His capital was converted from cash to fruit, and from fruit to cash, many, many times. There were substantial losses, followed by compensating profits. His separate property, consisting of $5,000 in cash, was indiscriminately mixed with borrowed funds, aggregating at one time $45,000 as has been stated. These funds, borrowed after marriage, were not acquired by gift, bequest, devise, or descent, nor were they the rents, issues, or profits of separate property. Clearly, under the circumstances of the present case, such borrowings belonged to the community. In the instant case petitioner admits that he had on hand at the beginning of the taxable year some tangible assets which he had at the time of his marriage. He computes their value to be $1,310. No reason has been assigned for eliminating from this category the timber tract contract, which had a value at the time of marriage of $4,726.29 and on January 1, 1940, of $2,872.54. Since the depreciated value of the automobile and office equipment and the *183 reduced value of the timber tract are being used in determining the capital at the beginning of 1940 then the computation referred to in the Oliver case should likewise be made, which requires that the withdrawals by petitioner for purposes relating to his separate property and obligations be added. It thus appears that the separate property of petitioner at the beginning of 1940 amounted to $13,983.63. Assuming a return of 8 per cent upon the capital and $15,000 as a reasonable compensation for petitioner's services, we conclude that 93 per centum of the income for 1940 and 91 per centum of the income for 1941 was community income and the remainder was separate income. Decision will be entered under Rule 50.