Estate of J. Macfie Anderson, Deceased, Ruth Kerr Anderson, Executrix, and J. Macfie Anderson, Jr., Executor v. Commissioner.
Estate of Anderson v. Commissioner
Docket No. 5330-70 SC.
United States Tax Court
T.C. Memo 1972-125; 1972 Tax Ct. Memo LEXIS 131; 31 T.C.M. (CCH) 502; T.C.M. (RIA) 72125; June 5, 1972
A. C. Clarkson, Jr., 1332 Pickens, Columbia, S.C., for the petitioners. Dudley W. Taylor, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in the estate tax of J. Macfie Anderson, deceased, in the amount of $473.30. In making this determination, respondent made several adjustments which are not here in dispute. Petitioners allege in this proceeding, however, that the value of 39 shares of the Ruff Hardware Company stock was overstated in the decedent's estate tax return. The only issue presented for decision is the value of that stock as of August 6, 1966, the date of decedent's death. Findings of Fact Ruth Kerr Anderson and J. Macfie Anderson, Jr., Executrix and Executor of the Estate of J. Macfie Anderson, deceased, *132 were legal residents of South Carolina at the time the petition was filed. They filed an estate tax return on behalf of the decedent's estate with the district director of internal revenue, Columbia, South Carolina. In such return, the estate elected to value the assets of the estate as of August 6, 1966, the date of the death of the decedent. At the time of his death, the decedent owned, among other assets, 39 of the 60 outstanding shares of the common stock of Ruff Hardware Company (hereinafter Hardware), a corporation organized under the laws of South Carolina in 1909. His son, J. Macfie Anderson, Jr., owned one share of that stock, which had been given to him by decedent in 1954, and the heirs of the Ruff Estate owned the remaining 20 shares; all the heirs of that estate were related by blood or marriage to decedent. At the time of decedent's death, Hardware was engaged in a retail and semiwholesale business, dealing in general hardware, tools, housewares, and gift items. It operated a main store in downtown Columbia, South Carolina, and branch stores in nearby suburban locations. The downtown store was located on property owned by Hardware at the southwest corner of the *133 intersection of Main Street and Blanding Street. The block in which the store was located was composed of similar types of business property. One of the city's leading department stores was located directly across Main Street from the Hardware property. This property was purchased by Hardware in about 1928. The corporation's balance sheets reflected the following assets and liabilities at the end of 1965 and 1966, respectively: 503 1965
1966
Assets:
Cash
$ 6,036.36
$ 16,063.36
Accounts Receivable
23,621.06
22,140.85
Inventories
205,601.83
211,857.35
Loans to Stockholders
8,619.05
8,619.05
Buildings & Other
Fixed Depreciable
Assets
11,753.82
10,057.43
Land
34,774.75
34,774.75
Cash Value - Life In- surance 22,742.60
2,103.43
Total Assets
$313,149.47
$305,616.22
1965
1966
Liabilities and Capital:
Accounts Payable
$ 500.61
$ 5,862.97
Notes Payable
21,800.00
Loans from Stockhold- ers
7,067.31
7,555.06
Common Stock
6,000.00
6,000.00
Earned Surplus & Un- divided Profits 277,781.55
286,198.19
Total Liabilities and Capital
$313,149.47
$305,616.22 The book value of the Hardware stock was $4,729.69 and $4,869.97 *134 per share as of December 31, 1965, and December 31, 1966, respectively. The land value, shown on these balance sheets and entering into the computation of the book value of the stock, has not been adjusted since at least 1962. The operating results of Hardware for the 4 years preceding the death of decedent and for 1966 were as follows: Year
Profit (Loss)
1962
$ (5,912.82)
1963
3,127.01
1964
(8,356.62)
1965
(23,823.77)
1966
(1,944.77)
After the decedent's death, the Richland County Probate Court appointed an appraisal committee to ascertain the value of the assets in decedent's estate. The appraisal committee determined the fair market value of the Hardware stock owned by decedent to be $5,644.42 per share. Subsequently, the determined value was reduced by the appraisal committee to $3,000 per share. The decedent, in 1962, purchased 10 of his shares of Hardware stock from Nancy Ruff at a price of $2,500 per share. In 1968, the heirs of the Ruff Estate sold 20 shares of their stock to Hardware for $2,500 per share. In the estate tax return filed for decedent's estate, his Hardware stock was included as an asset at a value of $3,000 per share. During *135 the examination of the return, the estate asserted that the value of the stock had been overstated and that it had a value of only $2,500 per share. In the notice of deficiency, it is stated: At the Appellate Conference you raised the issue that the value of the Ruff Hardware Company common stock should be included in the gross estate at a value of $2,500 per share as opposed to the $3,000 per share value returned by the estate * * *. We have carefully considered this issue and it has been determined that no adjustment to the returned value is allowable. Opinion In view of the determination made by respondent, petitioners have the burden of proving that the Hardware stock had a fair market value less than $3,000 per share. Welch v. Helvering, 290 U.S. 111 (1933). We do not think they have carried that burden. The value of property properly includable in a decedent's gross estate is its fair market value at the time of the decedent's death (unless the alternative valuation date is elected). Sec. 2031, Internal Revenue Code of 1954, as amended. The fair market value is the "price at which the property would change hands between a willing *136 buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. In formulating a judgment on the factual issue as to the fair market value of stock, it is necessary to consider all relevant facts and circumstances. See, e. g., O'Malley v. Ames, 197 F. 2d 256, 257-258 (C.A. 8, 1952). One fact on which petitioners rely heavily to carry their burden of proof is the price of $2,500 at which Hardware stock was sold in the two sales - one in 1962 and the other in 1968. While open market sales at arm's length are often regarded as the strongest evidence of value, we are not convinced that these sales can be taken as reliable proof of the value of decedent's Hardware stock at the time of his death. The time spans between the sales and decedent's death were substantial; one occurred 4 years before, and the other occurred 2 years after, his death. See Fitts' Estate v. Commissioner, 237 F. 2d 729, 731 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. Both sales involved minority interests, whereas the decedent's 39 shares represented majority control. *137 See, e. g., Mathews v. United States, 226 F. Supp. 1003, 1009 (E.D. 504 N. Y. 1964); Bartram v. Graham, 157 F. Supp. 757, 770 (D. Conn. 1957). The sales were not made in the open market but were negotiated between existing shareholders, all of whom were related by blood or marriage. None of the sellers sought other offers. See Gillette Rubber Co., 31 B.T.A. 483, 491 (1934), acq. XIV-1 C.B. 8. Moreover, the second sale - the one nearer the crucial date - was a "forced sale" in the sense that it was made because the stepmother of the Ruff heirs had been ill and the family needed money to care for her. The stock had paid no dividends, and the Ruff heirs were realizing nothing from continued ownership of the stock. None of the Ruff heirs was employed by Hardware. We are supported in our view that the sales are not a reliable guide to the stock's value by the report of the appraisal committee appointed by the Richland County Probate Court. That committee first appraised the stock at $5,644.42 per share. This valuation was later reduced by the committee to $3,000 per share after the long period of losses which Hardware had suffered was called *138 to its attention by the attorney for the estate, and the estate tax return reflected this $3,000-per-share value. We observe that the members of the appraisal committee were not called to testify; and the record contains no explanation of the discrepancy between the values found by that committee and those here advocated by petitioners. Petitioners are correct in their position that the losses realized by Hardware in the years preceding decedent's death are a factor to be taken into account. However, we do not think this factor is sufficient to show that the value of the stock was less than $3,000 per share. [1] We infer that the losses were due, at least in part, to poor management which was subject to change by the purchaser of the 39 shares. Cf. C.G. Meaker Co., 16 T.C. 1348, 1357 (1951), acq. 1952-1 C.B. 3. In this connection, J. Macfie Anderson, Jr., who succeeded to Hardware's presidency following his father's death, referred in his testimony to "an antiquated bookkeeping system during the years that are in question," the closing of two branch stores because they "were not profitable," and the fact that the one remaining branch is now "about breaking *139 even." Petitioners offered the testimony of an expert on stock valuations. But his testimony was very general. He had no precise knowledge of the data regarding the value of Hardware's stock. We can give his testimony little weight. On consideration of the whole record, we do not think petitioners have shown that the value of $3,000 per share for the Hardware stock is excessive. Decision will be entered for the respondent. Footnotes
1. This $3,000-per-share value is well below the unadjusted book value for the stock, and it is even below the book value after adjusting such value in order to reflect the amount which would be realized if the company were to be liquidated. See True v. United States, 51 F. Supp. 720, 725↩ (E.D. Wash. 1943). Moreover, as noted in the text above, the appraisal committee adjusted its valuation to the $3,000-per-share figure after Hardware's history of losses had been called to its attention.